(No. 16830.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LESLIE ELMORE, Plaintiff in Error.

*Opinion filed October 28, 1925.*

1. CRIMINAL LAW—*testimony of an accomplice should be acted upon with caution.* The jury may convict on the uncorroborated testimony of an accomplice if it satisfies the jury, beyond a reasonable doubt, of the defendant's guilt, but such testimony should be acted upon with great caution and should be carefully considered by the jury in the light of all the other evidence in the case, including the influence under which the testimony is given and whether the purpose of the witness is to shield himself from punishment or obtain some benefit.

2. SAME—*when verdict will be set aside as not warranted by the evidence.* The Supreme Court will not, when the evidence is conflicting, substitute its judgment for that of the jury, as the law has committed to the jury the determination of the weight of evidence and the credit to be given the witnesses, but if the court believes the conviction is based upon unsatisfactory evidence and that there is grave doubt of its sufficiency to establish guilt, it is its duty to set the verdict aside and reverse the judgment.

WRIT OF ERROR to the Circuit Court of Mason county; the Hon. GUY R. WILLIAMS, Judge, presiding.

GEORGE W. SPRENGER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, SCOTT W. LUCAS, State's Attorney, and MERRILL F. WEHMHOFF, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Leslie Elmore, Thomas Dabney and Francis Gilbert were jointly indicted by a grand jury in Mason county, at the November term, 1924, for robbery, while armed with a revolver, of Henry Seward of the sum of $325. At the previous February term the grand jury returned a separate indictment against John Lemons for the same robbery while

armed with a revolver. At the same term Lemons pleaded guilty to plain robbery, "said plea not extending to and including the charge of being armed with a dangerous weapon." He was sentenced to a term of not less than three nor more than twenty years in the penitentiary. The robbery was committed December 14, 1923. Gilbert was never apprehended. Elmore pleaded not guilty and was tried at the February term, 1925. Dabney pleaded guilty but sentence was deferred. Lemons was brought from the penitentiary, and he and Dabney both testified as witnesses for the prosecution on the trial of Elmore. He was found guilty, and the verdict found he had a confederate present, armed with a dangerous weapon. He brings the record here for review.

The abstract is imperfectly indexed and we have been unable to find in it the judgment on the verdict. The abstract contains the statement that after overruling motions for a new trial and in arrest the court rendered judgment on the verdict. We have, by examining the record, found the judgment, and the sentence was that defendant be confined in the penitentiary for a term of not less than ten years and may extend to life.

The principal error argued in the defendant's brief is that the evidence was insufficient. It is also contended the court refused to allow proper cross-examination of the State's witnesses, that the court erred in giving and refusing instructions, and that the State's attorney was guilty of misconduct on the trial which prejudiced defendant.

The principal contention of defendant is that the conviction is based on the testimony of Lemons and Dabney, confessed accomplices; that their testimony is unworthy of credit and is not corroborated by any other credible testimony.

Henry Seward, the man robbed, testified he was acquainted with defendant and Dabney. He saw Dabney at Cooney's corner, in Mason City, shortly after four o'clock

on December 14, 1923, after the C. & A. train had gone
north, again about six o'clock in the evening, and again
that night when Dabney came to witness' house between six
and seven o'clock.  Dabney came in a Ford coupe, and
witness started for the country with him to the home of
Munroe Davis to get a drink.  They went north from
Mason City about three miles, then turned on a road west
and went about 150 yards.  They saw a stick lying in the
road, and Dabney slowed up and stopped when they ran
over the stick.  Two men came from behind the car and
said, "Put up your hands!"  They ordered witness to get
out of the car.  Dabney hallooed, "Don't kill me!  I don't
want to die!" and then said to witness, "Why don't you
get up your hands?"  Witness asked him what for, and
Dabney replied, "You can't get out of there."  Witness said
he could if someone would open the door.  He got out of
the car.  Someone had a gun against him.  They took him
by the shoulder, put him in front of the car and punched a
gun in his back.  He told the party not to punch so hard;
that he was not going to do anything.  "They" took his
money ($325) from his shirt pocket.  Lemons took the
money from his pocket.  One of the men said to get back
in the car, and when he and Dabney got in the car they
were told to go on.  Dabney knew witness had the money
in his shirt pocket.  Witness showed it to him that after-
noon.  Witness never saw the robbers search Dabney.
While they were driving away from the scene of the rob-
bery he charged Dabney with "framing" the robbery.  Dab-
ney claimed he had been robbed of $10, and witness asked
him where he got the money.  He said he got it of Elmore.
There was not much more talk between them.  They drove
to Mason City and to the engine house, where the police
headquarters are.  No one was there, and they drove around
the block, met constable Melton, and witness told him of
the robbery.  He asked the constable to find Elmore, and
in a little while he found him and brought him to witness.

Witness took Elmore to one side and asked him if he loaned
Dabney money. He said he loaned Dabney $10. Witness
did not see Elmore at the place of the robbery.

John Lemons, on behalf of the State, testified he had
known defendant about three months before the robbery.
He first met him at defendant's house. Dabney and Jack
Roberts were there. He had seen him before that in Spring-
field with Dabney at the Briggs Hotel. He saw him on
December 14 at the C. & A. depot in Mason City, about
four o'clock, and also saw Dabney, Gilbert and some of
Dabney's relatives. He talked with defendant at that time.
Witness, Dabney and Gilbert talked about a "little job we
were to pull off." "They" were to take witness and Gilbert
"out there" after supper. Dabney was to get Seward out
there. Defendant went home. After supper at Davidson's
place, in Mason City, witness, Dabney and Gilbert left to-
gether. Witness saw Seward at a distance in Mason City.
He testified the three of them (Dabney, Gilbert and wit-
ness,) left together in a Ford coupe and went to defend-
ant's house. They left Mason City about six o'clock. The
three had a talk with defendant. Dabney was to go back
to Mason City and get Seward. Defendant was to meet
them at the Connor school house. Defendant said, "You
will have to frame some way to let Dabney know when to
stop the car," and suggested that a pole be laid across the
road for that purpose. At that time witness was unarmed.
He told them he had no gun, and defendant went into his
house, got his gun and gave it to witness. It was a big
gun,—more than a .32. Defendant, witness and Gilbert got
into the car and drove to the corner. Defendant was driv-
ing a touring car. Witness sat in the back seat and Gilbert
sat in front with defendant. They stopped about a mile
from defendant's house. Witness and Gilbert got out and
defendant drove on. He said he would drive on until they
"pulled the job" and get them at the corner. When Dab-
ney and Seward drove up they ran across the pole placed

in the road and stopped. "We told them to throw up their hands. They got out into the road, and after we took the money off of him we told them to get in the car and drive on. They did so. I took the money from Seward. Francis Gilbert put the pole across the road. After we took the money from Seward we went to the corner. We got the money out of Seward's shirt pocket. We found out where he carried his money at Les Elmore's house." Witness testified it was defendant who told them where Seward carried his money. After they took the money they went to the corner where defendant was waiting for them, got into his car and drove to Mason City. Defendant got out at a gasoline station and walked to Mason City, while witness and Gilbert drove the car to Springfield. Witness testified when they took the money from Seward "we had the guns on him." He did not know what time they arrived in Springfield. He saw defendant the next day at Springfield, about twelve o'clock at night, and had a conversation with him. He told witness he "got his split" at Charley Briggs' but did not say how much. Witness testified he got his share ($66) on the way to Springfield. On cross-examination witness testified he went to Mason City on December 14 "because Francis Gilbert was telling me about this job they had framed up between the three of them. Gilbert said that Tommy [Dabney] and Les [defendant] and him had a job framed and they wanted me to come up and help pull the job." That conversation took place in a barber shop in Springfield about a block and a half from the Briggs Hotel. Witness testified he went to Mason City in a car but did not know the fellow's name. Defendant told witness to put the pole across the road. Witness took the money from Seward's pocket and got $66 for his share. He saw defendant the night of December 15, about twelve o'clock, at the Briggs Hotel. Gilbert and Dabney were with him and were present when he "got his split." That took place in a hallway. Witness was in a back room

where cards were being played.   He did not know whether
it was a gambling room or not.

Thomas Dabney, a witness for the People, testified he
had known defendant about two years before December 14,
1923.   At that time witness lived on a farm with his father,
George Dabney.   Witness' father and defendant exchanged
work.   Witness had known Lemons about four months.   He
was at witness' home with Gilbert and another fellow wit-
ness did not know.   Defendant was not there at that time.
Witness had a conversation with defendant before Decem-
ber 14 about Seward having a roll of money on him, and
witness and defendant were aiming to get it some way.   Gil-
bert and Lemons came to witness' house and he told them
about it, and they said they would come up that night and
get the roll.   In the afternoon of December 14 witness saw
and talked with defendant in the C. & A. depot in Mason
City.   Lemons, Gilbert, defendant and witness were all
present and talked about getting Seward's roll of money.
Witness' grandfather and a cousin were in the depot, but
the four who talked about the robbery were the witness,
Lemons, Gilbert and defendant.   Witness saw defendant
that evening about 6:30 at defendant's home.   Witness
had brought "the boys" out from Mason City and they
there planned how to get Seward's money that night.   De-
fendant was to take Lemons and Gilbert to a place agreed
upon and lay a log across the road so witness would know
where to stop when he came out with Seward.   They were
then to be covered with guns and the money taken from
Seward.   Witness testified that was planned in defendant's
front yard.   Witness was there about fifteen minutes.   He
then went back to Mason City, leaving Lemons and Gilbert
at defendant's house, and got Seward.   Witness was driv-
ing a Ford coupe.   He called for Seward around seven
o'clock.   Seward had retired, but got up, dressed and got
in the car with witness.   They drove north on the hard
road three miles to the Lake Grove school house and then

turned west on Pennsylvania lane. About half or quarter
of a mile from the hard road they saw a log lying in the
road. When they hit the log witness ran the car toward
a fence and stopped. Lemons and Gilbert covered them
with guns and ordered them out of the car. Seward did
not want to get out, but they poked him with a gun and
he got out. They punched witness with a gun, and both
he and Seward got out. The robbers made them hold up
their hands and "went through" both of them. After the
robbery was completed they ordered witness and Seward
back in the car and they drove back to Mason City. Wit-
ness reported the hold-up to the chief of night police but
did not remember who he was. He saw defendant after
the robbery, about eight o'clock the same night, in front of
a garage across from a picture show. He told defendant
they had been held up. He saw him again the next morn-
ing and again in the afternoon. He was at his home in
the morning. In the afternoon he came after witness to
go to Springfield. They went there about 7:30 or 8:00
o'clock at night. They went to the Briggs Hotel, met Gil-
bert and the fellow that runs the hotel, Charley Briggs.
Witness there received his part of the money taken from
Seward. Gilbert, defendant and witness were present at
that time. Witness received from Gilbert $66.56. Defend-
ant was supposed to get the same amount. Witness was
present when the money was handed to defendant. Upon
cross-examination witness testified he did not see defendant
or his car at the place where the robbery occurred. Wit-
ness had no money in his pocket and nothing was taken
from him. About six o'clock he planned with Seward the
trip they were to take, then took Lemons and Gilbert to de-
fendant's house and came back and got Seward. They were
going to get some whisky. Witness did not see Seward's
money that night or where he kept it but had seen it previ-
ously several times. Witness had a revolver in his car.
When he, Lemons and Gilbert went to defendant's house,

defendant came out into his front yard and the parties there talked over the robbery. Defendant said he would take Lemons and Gilbert to a place near the hard road and would wait for them. A log was to be laid across the road to indicate to witness where the robbers were. Lemons and Gilbert stayed with defendant when witness went back to get Seward. When witness saw defendant next, about eight o'clock, across the street from a picture show in Mason City, defendant said he had loaned witness $10. Witness testified defendant did not loan him $10; that witness did not have fifty cents in his pocket. Witness was not excited about getting robbed. He was not afraid of the guns, as it was all made up. Lemons and Gilbert had the money, and defendant and witness went to Springfield the next night after the robbery to get their share. Lemons was not present when the money was divided. He had already received his share on the way to Springfield the night of the robbery. Witness said he told the police officer that he had lost $10 in the robbery, but that was not true. He did not borrow $10 from defendant on that day or at any other time. He gave his revolver to Gilbert at defendant's house. Defendant and Lemons were present at the time. It was a .32 Smith & Wesson and was loaded. He saw no other revolver at that time.

Dabney, recalled, testified he returned from Springfield in his Ford coupe. Defendant returned in his own Ford coupe. Witness owned a touring car, which was at defendant's garage the day of the robbery.

Charley Briggs, a witness for the State, testified he lived in Springfield. He was janitor of the Butler school and also ran the Briggs Hotel. He knew defendant and had seen him in the hotel three or five times. He saw him at the hotel on December 15. Dabney was with him, and they met Gilbert there. Witness was sitting at a table. The hall was brightly lighted. Witness could not see what they were doing, but they came in and passed by the table at which he

was sitting. All three had money in their hands. He saw them "splitting" money but did not know what money it was. He saw Lemons with them about twelve o'clock.

Vester Davis, a witness for the People, testified he saw defendant at the C. & A. depot in Mason City on February 14, shortly before four o'clock in the afternoon. Dabney, Gilbert and Lemons were with him at the time. Lemons and Gilbert ate supper at witness' house, but he did not know where they went after that.

The foregoing is the substance of the testimony on behalf of the People.

Defendant testified in his own behalf. He is a farmer, thirty-nine years old, married, and has six children. He flatly contradicted the testimony of Dabney and Lemons, and denied that he aided, assisted, abetted or advised with them, or anyone else, to rob Seward. He denied having any knowledge Seward was going to be robbed. He denied he owned a Ford touring car December 14 or at any time before that. He denied going to Springfield with Dabney the night of December 15 and denied knowing where the Briggs Hotel is. He testified the first time he ever saw Briggs was when he took the stand to testify. He denied he was ever in the Briggs Hotel, or that he ever received any money in any manner as proceeds of the robbery. He denied going into his house, getting a gun and giving it to Lemons. He denied telling Lemons and Gilbert in his front yard that Seward carried a roll of money in his shirt pocket. He denied Dabney, Gilbert and Lemons were at his house between the hours of five and six o'clock, or that he ever saw Lemons at his house that day or night. He denied inviting Lemons to come to Mason City or advising Dabney or Gilbert to do it. He testified he was at home about four o'clock on December 14 and stayed there until seven o'clock. About seven o'clock Caleb Hainline came to witness' house and they went to Mason City. Hainline's son was with them. They first went to a grocery store in Mason City

and Hainline went in and left a list for groceries. They then went to Dan Mulford's, where witness went in to see about buying a shot-gun Mulford had for sale. Hainline stayed in the car. It was a Ford touring car and belonged to Hainline. Witness was in Mulford's about fifteen minutes, and from there the parties went back up-town. Witness got out of the car in front of Keester's grocery store and went into the store. It was about eight o'clock then. He was in the grocery store probably ten minutes and then went to a picture show. A few minutes after he went into the show constable Melton came for him and they went over to the council room. Seward and several others were there. Witness had no knowledge what he was wanted for. Seward asked witness if he let Dabney have any money, and he replied he let him have $10. Seward said he had been robbed. Witness rode home with Dabney in a Ford coupe. Hainline was working for witness at the time and had been for about three years. Witness testified Dabney did not come to his house the morning of December 15. He drove by witness' house in the afternoon in going to town, and witness rode to town with him about 1 :30 o'clock. Dabney lived about a quarter of a mile from witness. Witness returned home about four o'clock and stayed home the rest of the night. Hainline's folks were at witness' house that evening from 7 :30 or 8 :00 o'clock until around midnight. Hainline, his son and defendant were playing cards till about eleven o'clock. He testified that he did not drive Lemons and Gilbert to the vicinity of the robbery or drive them away after the robbery. He never suggested the placing of a log or pole across the road to indicate where Dabney should stop his car. On cross-examination he denied Dabney's touring car was at his house the day of December 14, but it had been before that time. At times he and Dabney drove each other's cars when their own cars were out of commission. December 14 witness' car was at Greenfield's garage, in Mason City. The Dabneys owned a

Ford coupe and a Ford touring car. Witness owned a Ford coupe. He knew Lemons by sight and had met Gilbert at Dabney's a few times. Witness was at the depot that afternoon and saw a man there they said was Lemons. Witness was present at the depot with Gilbert, Lemons, Dabney, old man Dabney, and his cousin. He was with the Dabneys probably a half hour, but did not meet Lemons and never had any talk with him on any subject. The depot room is about eighteen feet square. Lemons did not seem to be talking to anyone and Gilbert was talking to old man Dabney. Witness did not talk to Thomas Dabney. He saw Vester Davis there. Witness left the depot immediately after the train departed. The last man he talked to was old man Dabney. The train left at 4:19, and witness drove home in George Dabney's touring car. Nobody was at home at Dabney's, and witness left the car in the garage there and walked home.

Caleb Hainline, for the defense, testified he was working for defendant December 14, 1923. Defendant helped witness do the chores between five and six o'clock in the evening of that day. No one was at the house but defendant's family. Witness left the house about 5:30 o'clock and saw defendant again at his home at seven o'clock that evening and was with him about an hour. Witness then went to Mason City with his son in his son's Ford touring car and defendant went with him. At Mason City witness left a bill for groceries at a grocery store. From there they went to Mulford's, and defendant got out and went in to see Mulford. He was in there twenty-five minutes, and they went from there back to Keester's store, where defendant got out. Witness and his son then drove to the grocery store, got the groceries and went home. They left defendant at Keester's store and witness did not know where he went from there. That was close to eight o'clock. It is about a twenty or twenty-five minutes' walk from defendant's home to witness' home. On re-direct examina-

tion witness testified he saw defendant the morning of the 15th of December, and also at noon, and again at night of the same day, at his home. Witness, his son and two daughters were at defendant's until about eleven o'clock the night of December 15. Defendant was there also.

Edgar Hainline, son of Caleb, testified to substantially the same facts as his father.

Norman Mulford testified for the defense that defendant was at his house in Mason City on December 14 between seven and eight o'clock at night. Witness had a shot-gun which defendant wanted to buy, and he was there about fifteen or twenty minutes, but did not buy the gun.

P. J. Keester testified he kept a grocery store in Mason City. He saw defendant the night of the robbery but could not say at what time he saw him, except it was after supper. Witness closed his store at nine or ten o'clock. It was not long after supper that defendant came to the store. On cross-examination witness said it must have been around eight o'clock when he saw defendant.

L. J. Bennett testified he was running a picture show in Mason City on December 14. The show started at 7:30 and closed at 11:00 o'clock.

Harry F. Melton, a constable, testified he was at the picture show December 14. Seward came and called him out. He said that he had been held up and wanted witness to go to the country with him, and he did so. Seward said Dabney had told him he had $10 he got of defendant, and Seward asked witness to go to the picture show and ask if defendant had given the money to Dabney. Witness called defendant out of the show and they went to the council room at the engine house, where he left defendant.

Eight witnesses testified defendant's reputation in the neighborhood where he lived, as a peaceful and law-abiding citizen, was good prior to the 14th day of December, 1923.

Lemons was serving a term of not less than three nor more than ten years upon a judgment rendered under a plea

of guilty to an indictment returned against him, separately, by the grand jury at the February term for this same robbery with a gun. He pleaded guilty to simple robbery and was given the penalty fixed by law for that crime. If he had pleaded guilty or had been tried and found guilty of robbery with a gun the penalty would have been not less than ten years and might extend for life. Dabney, who was jointly indicted with defendant, entered a plea of guilty, but his sentence was deferred. He was confined in the county jail at the time he testified as a witness for the People. Without their testimony there was no evidence to establish the guilt of defendant. Their own testimony conclusively shows them to be conscienceless criminals. Their testimony connecting defendant with the robbery is corroborated only by the testimony of Briggs. In view of defendant's proof we would have no hesitation in saying that without corroboration the testimony of Lemons and Dabney was not worthy of sufficient credit to establish guilt beyond a reasonable doubt. The testimony of an accomplice is competent, and we have held that a jury may convict on the uncorroborated testimony of an accomplice if it satisfied the jury, beyond a reasonable doubt, of defendant's guilt. We have also held, and the universal rule is, that the testimony of an accomplice is subject to grave suspicion and should be acted upon with great caution. It should be carefully considered by the jury in the light of all the other evidence in the case; also the influence under which the testimony is given, and whether the purpose of the witness is to shield himself from punishment or obtain some benefit for himself. If, all the circumstances considered, such testimony is believed to be true and is of a character to prove guilt beyond reasonable doubt it will authorize a verdict of guilty. *People* v. *McKinney,* 267 Ill. 454; *People* v. *Rosenberg,* 267 id. 202.

This court has many times decided that the law having placed the determination of defendant's guilt in the hands

of the jury, it is only when satisfied, from a consideration of the whole evidence, that there is a reasonable doubt of defendant's guilt that the court will set aside a verdict as not warranted by the evidence. We have further held, this court will not, when the evidence is conflicting, substitute its judgment for that of the jury, but we have also always held that a jury's verdict of guilty is not conclusive of the sufficiency of the evidence, but that it is the right and duty of this court, on review, to set the verdict aside if satisfied there is a reasonable doubt, from a consideration of all the evidence, of the defendant's guilt. The court is reluctant to exercise its power in that regard, but its duty and the rights of citizens make it necessary that it do so in proper cases.

The only testimony which in any way tended to corroborate Lemons and Dabney was that of Briggs, who testified to seeing defendant at the Briggs Hotel the night of December 15, (which was the next night after the robbery,) in company with Lemons, Dabney and Gilbert. The description of the Briggs Hotel and what was going on there that night, given by the witnesses, is quite meager, but is enough to create an unfavorable impression of the character of the place and of the proprietor. We do not consider the testimony of Vester Davis of any value as corroborative of Lemons and Dabney. Davis testified to seeing defendant, Lemons, Dabney and Gilbert at the C. & A. depot in Mason City the afternoon of December 14. Defendant in his testimony admitted he and the others mentioned were in the depot at the same time, but he denied meeting or speaking with Lemons. The reason Dabney and defendant were at the depot, according to the testimony, was that some of Dabney's relatives were going on a train which left about 4:30 o'clock. There is nothing of any corroborative import in Davis' testimony. The conviction was based alone on the testimony of Lemons, Dabney and Briggs. We have said, and we repeat, that we would not affirm the con-

viction if it depended upon the uncorroborated testimony of Lemons and Dabney. In addition to their disreputable character, as shown by their own testimony, Lemons in some way procured an acceptance of his plea of guilty of simple robbery to an indictment charging him with the more aggravated crime of robbery with a gun. The penalty for the crime he pleaded guilty to was from three to twenty years, while the penalty for the crime charged in the indictment, and which he admitted in his testimony he was guilty of, was from ten years to life. There was no proof of any agreement by any of the public officers that if Lemons would testify for the State he would be permitted to plead guilty to a lesser crime having a much smaller penalty than the crime charged against him in the indictment. Neither was there proof of any agreement or understanding that Dabney was to receive any benefit for testifying, but it is a significant fact that although he plead guilty to the indictment returned against himself and defendant, judgment and sentence on the plea were deferred.

In *People* v. *Temple,* 295 Ill. 463, Temple and Craig were jointly indicted for burglary. They were convicted and Temple sentenced to the penitentiary. Craig was under twenty-one years of age, and he was later sentenced to the State reformatory but was at once committed to the care of his father. Temple denied guilt and testified on the trial in his own behalf. Craig was called by his attorney ostensibly as a witness for the defense, but he had already confessed his guilt. He testified Temple assisted him in the commission of the crime. The court refused an instruction asked by Temple that if the jury believed Craig was induced to testify by any promise or hope held out to him that it would go easier with him, the jury should take that fact into consideration in determining the weight that should be given his testimony. There was no proof that any promise had been made Craig or hope held out to him, but this court said, that although ostensibly testifying as a

witness for the defense, he was, in fact, a witness for the prosecution, and further said: "It needs no power of divination to comprehend the fact that there was some sort of understanding, expressed or implied, or a reasonable expectation, that Craig would be benefited by giving testimony which would convict Temple, which was the only purpose of his examination. He had confessed the commission of the crime and at no time denied it but had pleaded not guilty. Without his testimony there was nothing which would have formed a sufficient basis for the verdict of guilty. He was called ostensibly as a witness for the defense and gave the only legitimate evidence to prove Temple guilty. What followed is convincing of the existence of a previous understanding or an expectation of leniency, which was realized. Temple was sentenced to the penitentiary and four days afterward a sentence of Craig was pronounced, and he was immediately committed to the care of his father."

Defendant is a farmer and has resided in the neighborhood of Mason City more than twenty years. His residence is about four or five miles from the town. According to the testimony of Dabney, the place of the robbery was between three and four miles from Mason City. He testified he took Lemons and Gilbert to defendant's home about 6:30 o'clock and the parties talked together there about fifteen minutes. He then drove back to Mason City for Seward. He said that was around 7:00 o'clock. Seward had retired, but got up and got in the car with Dabney. Dabney testified they drove north three miles, then turned west and drove half or a quarter mile or more to the place where the robbery took place. Seward testified he had no watch, but his best judgment was the robbery occurred between seven and eight o'clock. Mulford, on behalf of defendant, testified defendant was at his house in Mason City fifteen or twenty minutes between seven and eight o'clock, talking about buying a shot-gun from witness. Keester testified de-

fendant was in his store in Mason City that evening around eight o'clock. Witness said it was not long after supper, and that he closed his store at nine or ten o'clock. Melton, the constable, testified defendant was at a picture show in Mason City that evening. He could not state what time he came to the show, but Seward called him out and told him of the robbery and wanted him to go with him to the scene of it. Witness thought he did go with him, and that it was after their return he went to the show and got defendant to come out, at Seward's request. Bennett testified he was proprietor of a picture show in Mason City, and the picture shown the night of December 14 was "The Man Next Door." The show began at 7:30 o'clock and lasted until 11:00 o'clock.

It is highly improbable, unless the witnesses referred to were mistaken, that defendant could have been where Lemons and Dabney testified he was at the time of the robbery. In addition to that testimony was the testimony of Caleb and Edgar Hainline, and unless their testimony was untrue defendant was not at or near the scene of the robbery, and could not have taken Lemons and Gilbert there and waited for them until the job was finished and then have driven with them to Mason City. On behalf of defendant, the county judge, four farmers, two business men in Mason City, and one man who testified he had retired, testified they knew defendant, most of them for many years, and that prior to December 14 his reputation as a peaceable, law-abiding citizen was good. Nothing appears in the record which tends in any way to affect the credibility of any of the witnesses who testified to defendant being in Mason City at seven or eight o'clock the evening of December 14 or that he had always borne a good reputation as a peaceable and law-abiding citizen, and considering their testimony in connection with all the other testimony, defendant's guilt was not proved beyond a reasonable doubt.

While the law has committed to the jury the determination of the weight and credit to be given the witnesses and authorizes a verdict of guilty when a consideration of all the credible evidence warrants the belief, beyond a reasonable doubt, that defendant is guilty, the law also makes it the duty of this court, in reviewing a judgment of conviction, to consider the evidence, and if the court believes the conviction is based upon unsatisfactory evidence, and that there is a grave doubt of its sufficiency to establish guilt, the judgment should be reversed. *People* v. *Wieland,* 313 Ill. 594; *People* v. *Zammuto,* 280 id. 225; *People* v. *Bolik,* 241 id. 394.

Most of the other errors alleged are not of a very serious character, are not likely to occur on another trial, and therefore do not require discussion.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*