(No. 20036.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAYMOND G. LACEY, Plaintiff in Error.

*Opinion filed April 17, 1930—Rehearing denied June 6, 1930.*

COSTIGAN & WOLLRAB, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOSEPH W. DEPEW, State's Attorney, and JOEL C. FITCH, (EDWARD BARRY, JR., of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Raymond G. Lacey, was in the circuit court of McLean county indicted, tried, convicted and sentenced to the penitentiary for the larceny of a cow, the

property of Tobey Bane, of the value of $106.62. The cause is here on writ of error.

During the night of March 24-25, 1929, Ed Phillips drove his motor truck from his home, just outside of Bloomington, twenty-six miles to the farm of Tobey Bane, stole a cow, loaded it on his truck and returned to his home about 4:00 o'clock in the morning, where he remained for about two hours, when he took the cow on his truck to Peoria and sold it to a commission merchant by the name of Boley, who gave him a check for $106.62 in payment therefor. Bane, discovering his loss about 6:00 o'clock in the morning, went to Peoria, found the cow, claimed his property and re-sold it to Boley, who stopped payment on the check which he had given to Phillips. Phillips was arrested on the evening of that day, confessed his guilt and implicated plaintiff in error. They were both indicted, and it was stipulated on the trial that Phillips' case was the next on call on the trial calendar after that of plaintiff in error and that Phillips had entered a plea of not guilty.

Phillips on the trial testified that on the evening of March 24, 1929, plaintiff in error came to his home and suggested that they go out that night and see if they could not get a cow; that they talked it over awhile and plaintiff in error said he would come back later; that plaintiff in error returned between 11:30 and 12:00 o'clock, when they had some talk and made up their minds to go out and get a cow; that they took witness' truck, went to the Bane farm, got a cow, loaded it on the truck and returned to witness' home about 4:00 o'clock in the morning, where they both remained until about 6:00 o'clock in the morning, at which time witness, leaving plaintiff in error there, left for Peoria, went to the Peoria Stock Yards, sold the cow to Boley and received a check for $106.62 therefor, payment upon which was subsequently stopped; that plaintiff in error and witness agreed to divide the money; that he saw plaintiff in error between the time he went to Peoria and the time of his ar-

rest but just passed him by without speaking to him. On cross-examination, after denying that he ever had a talk with anybody about the fact that he would have a mitigation of the penalty in his case, this question was asked him: "Has your father, Labon Phillips, ever told you that he had arranged for a mitigation of penalty for you if you would testify in this case?" and he replied, "He said he would ask for it." After having stated that his father, who was the sergeant of police of Bloomington, had never said anything else to him on that matter, and after some equivocation as to whether or not there was anything said between him and his father that he would get better treatment in the way of mitigation of the penalty, or any other way in regard to penalty, in case he testified against plaintiff in error, he said that his father told him that if he would tell the truth it would be better for him and that if he testified against plaintiff in error he would be more apt to get favors, and that his father told him that he had talked to the State's attorney; that plaintiff in error had a horse in witness' barn, and a couple of days after his arrest witness told plaintiff in error that after he got through with his work, which was about 10:00 o'clock in the evening, he should come out to witness' place and get the horse; that there were officers there when plaintiff in error arrived; that he had made arrangements with the officers to be there; that he called them up after he got home; that he had a conversation with plaintiff in error at that time in the barn; that he asked him what his idea was in trying to lay all the blame on witness, and if he did not know that at the time they were out there that witness told him they had better leave the cow and go back, and that plaintiff in error said he did not remember what was said out there. As to this conversation Phillips was in part corroborated by two deputy sheriffs who were peeping through a crack in the rear of the barn and recited the conversation in varying language, and also by Arthur Stevenson, Phillips' brother-

in-law, who had accompanied him on his ride the day before the theft past Bane's farm. Stevenson, however, testified that the conversation took place on Monday night about 9:00 o'clock and that there were three men there, one the sheriff sent out. Phillips denied having had any previous trouble with plaintiff in error, but admitted that plaintiff in error and a justice of the peace, just prior to the time in question, had been trying to get witness to pay money which he owed plaintiff in error. Phillips was corroborated by his wife as to plaintiff in error's two visits to Phillips' residence prior to the theft.

V. O. Pike, a witness for the defense, testified that about two and a half weeks prior to the trial, at witness' home, Phillips told him, in substance, "they told me if I testified against Lacey in his case that will clear me," and that Phillips also said, in substance, "I am not afraid; they will clear me all right." Mrs. Nora Funk, Mary Funk and John Funk testified that on the night of March 24, 1929, plaintiff in error, who was then boarding at the Funk home, came there about 9:15 o'clock, parked his car in the yard near the fence, about fifteen or twenty feet from the road, and that he remained at the Funk home until 5:00 or 6:00 o'clock the next morning. Mary Funk, Hazel Lacey and Theodore Lacey testified that they went with plaintiff in error when he went to Phillips' home to get the horse; that when they arrived there Phillips came out of the barn and said to plaintiff in error, "What are you trying to do? Lay all this blame on me?" and plaintiff in error said, "I don't know what you are talking about—laying the blame on you; we will wait and let the law take care of it;" that Phillips did not go into the barn on that occasion but remained outside while plaintiff in error went in and got his horse. Counsel for plaintiff in error attempted by these witnesses specifically to contradict the testimony of the witnesses for the State which purported to show what took place between Phillips and plaintiff in error on that occa-

sion, but the court sustained the objection of the State thereto. H. C. Kelly testified that on the morning of March 25, 1929, he saw plaintiff in error's automobile in the Funk yard between 4:45 and 5:00 o'clock in the morning, at which time according to Phillips the car was at the Phillips home. Charles S. Moore testified that about 1:45 on the morning of March 25, 1929, he saw plaintiff in error's car in the Funk yard at a time when according to Phillips the car was at the Phillips place.

On cross-examination of Phillips by counsel for plaintiff in error he was asked these questions: "And what did you do with that check?" "Did you afterwards get the money on that check?" "Did you afterwards offer to divide anything you got for those cows or this cow with Raymond Lacey?" "Did you arrange with the officers to come out there to hide?" "Hadn't your father talked about the officers coming out there?" "What was your purpose in getting the officers out there at that time?" To each of these questions the court sustained an objection.

Phillips had testified that at the time of the theft the arrangement was that the money received from the cow was to be divided between plaintiff in error and himself, and it was legitimate cross-examination to ascertain what he had done with the check, and whether or not he had at any time offered to divide the spoils with plaintiff in error or had said anything to him on the subject. The witness was testifying as an accomplice and attempted to shift the main burden of the crime upon plaintiff in error, and under such circumstances his cross-examination should not have been unduly limited, and plaintiff in error should have been given every opportunity to ascertain the motive with which the witness was testifying, so that the jury might be able to judge whether he was testifying to vindicate the law and preserve the good order of society or whether he was prompted by the desire to save himself from deserved punishment.

When Ethel Phillips was called as a witness plaintiff in error's counsel objected to her testifying on the ground that no notice had been given. The court gave him time to talk with the witness out of the court room and when they returned thereto counsel renewed his objection, to which the court said, "Let the record show that the court gave defendant's counsel time to talk to witness before," and overruled the objection. Counsel for plaintiff in error objected to the testimony of the witnesses Ashabrand and Claggett, the two deputy sheriffs, on the ground that he had received no notice that these witnesses were to testify until after the case had started for trial at the afternoon session during which these witnesses were called. The court overruled the objections, and these rulings are assigned as error. While the officers for the State had knowledge that these witnesses could give material testimony some months before the trial, we do not consider it necessary in this case to determine whether these rulings were an abuse of the court's discretion.

On the motion for a new trial the affidavit of Frank Jordine was filed, to the effect that on the morning of March 25, 1929, he arose at 3:30 o'clock A. M., drove his Ford truck to his father's home, in Bloomington, to procure two body clamps for his truck, obtained the clamps and immediately drove back to his own home; that the trip did not take over half an hour; that he returned to his own home at approximately 4:00 o'clock A. M.; that he drove his truck into his yard, stopped, and went to the front door of his house; that when he reached this point he heard a motor car approaching from the east; that at this time it was comparatively light and that he saw the truck of Phillips laboring to the top of the hill; that the truck carried a rack and a cow upon the truck portion of the car; that he could see into the rack and that nothing else occupied the truck portion except the cow; that he could plainly see into the cab of the car through the windshield in the side

window and saw Phillips driving the car and that there was no other person in the car; that he told no one of these facts until after the trial. Plaintiff in error also filed the affidavit of Edward Walsh, in which it was stated that he overheard a conversation between Phillips and plaintiff in error during the latter part of September at the M. Walsh & Sons' stone plant in Bloomington where plaintiff in error was employed; that affiant was about fifteen feet from them, with some stone piled between them; that Phillips said to plaintiff in error, in substance, "Lacey, if you will go to Clint White and take care of that note so that they won't sell me out I will get on the stand and say that you had nothing to do with the cow;" that Lacey answered, "Why should I do that when I had nothing to do with it? You know damn well I had nothing to do with it;" that Phillips answered, "Yes, I know you had nothing to do with that, but we could fix it up at the trial;" that affiant told no one about overhearing this conversation until after the trial. Plaintiff in error and one of his attorneys filed an affidavit as to the exercise of diligence by them to obtain witnesses, and that they had not known of the witnesses Jordine and Walsh until after the trial. It is claimed by the State that the evidence of these witnesses was merely cumulative; that Walsh's testimony was cumulative and could be used solely for the purpose of impeaching Phillips, and that due diligence had not been shown. The claim of lack of diligence comes with poor grace from the prosecutors, who had been allowed to call the witnesses Mrs. Phillips, Ashabrand and Claggett. The evidence of Walsh could be used solely for the purpose of impeaching Phillips and was not a sufficient basis for the granting of a new trial. (*People* v. *Johnson,* 286 Ill. 108.) The statements in the affidavit of Jordine were not cumulative or merely for impeachment. No other witness had testified to seeing Phillips or the cow from the time Phillips left his home to steal the cow until he arrived with it in Peoria.

At the request of the State the court gave to the jury the following instruction:

"The court instructs the jury that before a defendant can avail himself of the defense of an alibi, the proof must cover the whole of the time of the commission of the crime, so as to render it impossible, or highly improbable, that the defendant could have committed the act and unless the proof in a case covers the whole time, so as to render the commission of the crime by a defendant impossible or highly improbable, then that defense is not available to such defendant."

In this case the evidence of plaintiff in error's alibi witnesses covered the whole of the time of the commission of the offense, and the giving of this instruction to the jury under this state of the proof might well be taken by the jury as an intimation by the court that there was some question as to the sufficiency of the alibi other than the question of the veracity of the witnesses. While the giving of this instruction has been held in several cases, including *People* v. *Schladweiler,* 315 Ill. 553, to be proper where the evidence warrants it, yet where, as in this case, the evidence of the alibi witnesses covered the entire time it was held to be reversible error. *People* v. *Frugoli,* 334 Ill. 324; *People* v. *Reno,* 324 id. 484; *People* v. *Braidman,* 323 id. 37.

The court gave to the jury an instruction as follows:

"The court instructs the jury that the burden of establishing the defense of an alibi is on the defendant and to maintain it, it is incumbent upon him to prove facts and circumstances which, when considered in connection with all the evidence relied upon to establish his guilt of the crime charged, is sufficient to create in the minds of the jury a reasonable doubt of the truth of the charge and if the evidence introduced in this case to maintain the defense of an alibi, when considered with all the evidence relied upon to establish defendant's guilt of the crime charged, is not

sufficient to create in the minds of the jury a reasonable doubt of the truth of the charge, then that defense is not available to such defendant."

The burden of proof in a criminal case never shifts to the defendant; and this is true whether the defense is an alibi, insanity or other defense of a positive character. This instruction is also objectionable in that it confines the consideration of the jury to the proof of the alibi and all of the evidence relied upon to establish the guilt of the defendant, and then tells them that if after such consideration they find the evidence not sufficient to create a reasonable doubt of the truth of the charge then the defense of alibi is not available to the defendant. It is the duty of the jury not only to consider all the evidence bearing on the defense of an alibi and that relied upon to establish the guilt of the defendant but also all the other evidence in the case, and if after such consideration there arises a reasonable doubt in the mind of the jury as to the defendant's guilt he should be acquitted. No part of the evidence should be omitted from this consideration. *People* v. *Robinson,* 308 Ill. 398.

Complaint is made as to the giving of instructions on behalf of the State and to the refusal of instructions tendered on behalf of plaintiff in error on the subject of the credibility of an accomplice and the weight to be given to his testimony. By an instruction given on behalf of the State the jury were told that they were to pass upon the credibility of an accomplice as they would pass upon the credibility of any other witness. In *People* v. *Rongetti,* 338 Ill. 56, this court said: "The jury are not to pass upon the testimony of an accomplice as 'they do upon any other witness,' but they are to consider it as subject to grave suspicion and must act upon it with great caution, and only when they are satisfied from the testimony of such accomplice and all the circumstances in evidence that the guilt of the defendant is proven beyond a reasonable doubt will

they be warranted in convicting a defendant on such testimony." To the same effect are *People* v. *Elmore,* 318 Ill. 276, and *People* v. *Lindsey,* 326 id. 212.

It is also complained that the court modified instructions tendered by the defendant by striking out portions thereof containing correct propositions of law in such manner as to leave the part stricken out clearly legible by the jury. While in this case the instructions as tendered contained correct propositions of law and had previously been approved by this court in the form in which they were tendered, the court properly modified the same. In modifying an instruction, however, the instruction should either be re-written or the part stricken out should be entirely obliterated, so that no part of it may be legible to the jury and they be misled into thinking the part stricken out did not state the law correctly.

In the instant case no witness other than the accomplice, Phillips, gave any testimony directly tending to show plaintiff in error's complicity in the crime. The conviction, therefore, rests upon the testimony of such accomplice. It was therefore most highly important that the jury should be correctly instructed and that no errors be committed in the admission or rejection of evidence. This was especially true in this case, as the record shows that immediately after plaintiff in error's conviction the accomplice was released upon probation.

From an examination of the record we are of the opinion that the ends of justice require that plaintiff in error should be given a new trial. The judgment of the circuit court is therefore reversed and the cause remanded to that court.                    *Reversed and remanded.*