THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE BALTIMORE, Defendant-Appellant.

(No. 71-173;

Second District—July 11, 1972.

*Supplemental opinion upon denial of rehearing October 26, 1972.*

634

Ralph Ruebner, of Defender Project, of Elgin, for appellant.

Jack Hoogasian, State's Attorney, of Waukegan, (Dudley E. Owens and Michael J. Cummins, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE GUILD delivered the opinion of the court:

Following a jury trial, Willie Baltimore was found guilty of murder, convicted and sentenced to serve a term of 30-60 years in the penitentiary.

A number of issues are raised in this appeal which we will consider separately including the question of whether the conviction should be reversed because (1) defendant was denied discovery of two documents relating to other persons who were present at the scene of the shooting, (2) whether in-court identification of any eyewitness should have been excluded as being without origin independent of a suggestive procedure at the police station, and (3) a question of conflict of evidence including the admission and rejection of certain testimony. We also consider the question, *sua sponte*, of the jury's deliberations.

On the night of February 21, 1970, the deceased, Gean Saulmetellus (sometimes referred to as "*Metellus*" in the record), and his friend, Pedro M. Montalvo, drove about for three hours. Both men carried large amounts of cash, Montalvo having $200. They stopped at a number of places and arrived at the High Chapparal, a teen-age nightclub in Waukegan about 10:30 P.M. where Metellus offered money to a Jimmy Coleman to find them prostitutes.

When the High Chapparal closed at 2:00 A.M., a large group of people poured out onto the sidewalk and street. Saulmetellus and Montalvo, sitting in their car parked in front of the club, called several youths and girls over, again discussing prostitutes. Several persons including Jimmy Coleman, John Coleman, and defendant went over to the car, which Saulmetellus drove slowly down the street following several girls. The men in the car again called several people over, and while they were haggling about money, Saulmetellus was shot twice, and died several hours later.

Montalvo testified that he heard a shot, turned around and saw Baltimore. Saulmetellus tried to grab the man, and Baltimore was standing there when a second shot was fired. Montalvo testified he never saw a gun, but saw fire coming from Baltimore's hand. At the time he heard the two shots there were three or four people on the driver's side, two of them were girls, and Baltimore was allegedly wearing a leather jacket.

Jimmy Coleman, another eyewitness called by the State described Baltimore's clothing that night, including a black leather jacket, although he did not recall what he himself had been wearing, nor whether he'd been wearing a coat although the weather was cold. Shortly before the shooting, Coleman said Baltimore declared he was going to get money from Metellus, displayed a .25 caliber automatic pistol and laughingly said, "I'm going to shoot him." He said he saw Baltimore walk over to the driver's side of the car and stand there with two girls when a shot was fired. The deceased lunged at defendant and another shot sounded. Coleman then ran to the apartment of Arthur Barnes where he alleged Baltimore appeared shortly afterwards and announced he had shot Saulmetellus in the leg and head. On cross examination Coleman denied having a gun that night, and a defense investigator testified Coleman had previously stated Saulmetellus had a lot of money and had shown it to him.

Barbara Geater, a 15 year old girl, testified Baltimore wore a black leather jacket, that Jimmy Coleman was not at the driver's side of the car at the time of the shooting, and said she saw flashes coming from Baltimore's hand. After the deceased fell to the ground, she said Baltimore stood over him and reached down checking his pockets. She acknowledged being a good friend of Junella Wilkins, and knowing Johnny and Jimmy Coleman.

Oscar Wright, a 12 year old boy who was warming up his mother's car said the defendant ran past him after the shooting wearing a black leather jacket.

Junella Wilkins, an eighth grade student, testified defendant wore a black leather jacket and called her over to the driver's side of the car saying the man wanted to buy two girls. She heard a shot, saw deceased grasp his leg, get out of the car, and start wrestling with defendant who shot him again. She saw a gun in defendant's hand and saw him go through the deceased's pockets after he fell to the ground. All this happened while Jimmy Coleman was standing on the sidewalk. She knew Jimmy Coleman, but he was not a friend. She also knew his brother John Coleman, who was a friend, and she was related by marriage to another witness, Mary Simmons.

Mary Simmons (17) was called by the State in rebuttal over defen-

dant's objection. She testified similarly about the shooting, said she had known defendant about a month, had never been "real close" to Jimmy Coleman, but had been real close to John Coleman whom she had known four years.

Jimmy Coleman's testimony on the witness stand was in conflict in several instances with his pre-trial testimony. On cross-examination at one time when he was asked if he had lied previously, he responded "I may have" and when asked if he were only honest with people he knew, he responded "Yes."

Junella Wilkins on the witness stand stated that Willie Baltimore was wearing a black leather coat but she had previously stated he was wearing a velvet jacket. Likewise, Mary Simmons had said he was wearing a velvet jacket but on the witness stand she too stated he was wearing a black leather coat.

Several of the witnesses could not recall what any of the others were wearing but six witnesses including Coleman testified Willie Baltimore was wearing a black leather coat.

Examination of the record as a whole discloses many discrepancies in the State's witnesses' testimony, including Darrell Ringgold who said Baltimore came to the house or apartment of Arthur Barnes after the shooting and stated that he had shot the victim in the head but at the trial Ringgold said he "really did not know whether he said it or not."

This court is somewhat astounded at the conflicting testimony found in the record. No useful purpose would be served by reiterating the conflicting testimony. Prevarication would seem to predominate in the case of a number of the occurrence witnesses.

■■ Additionally, the State contended that Willie went to the Barnes apartment after the shooting. This, Baltimore denied. The trial court after determining Ringgold was lying, either at the trial or before, properly, refused to call him as the court's witness. The court then held that further testimony as to Willie's presence at the apartment was cumulative in rebuttal, but Coleman had placed Willie at the apartment where Willie allegedly said "He put the gun up to his head (the victim) and pulled the trigger." It would appear that the testimony, if any, of the other occupants of the apartment was highly relevant after the defendant had denied going to or being in the apartment.

Another inconsistency appearing in the record which is not explained is with relation to the number of men on the driver's side of the car when the driver Saulmetellus was shot. Coleman in his statement taken by the defense before trial, stated that there were two men on the driver's side, but at the trial testified that only Baltimore was on the driver's side. Mary Simmons also testified that "another boy" was on the driver's side.

The witness Montalvo allegedly stated to the defense before trial that there were two or three men on the driver's side.

■■ The defense filed a comprehensive pre-trial motion for discovery to which the State responded. During the presentation of the State's case in chief, after the testimony of Montalvo and Coleman, the prosecution turned over to defense counsel the police file of the incident except for two documents. Although the defense specifically requested production of these documents, it was not aware of their contents until the trial was concluded. Defense counsel first read the documents when they were attached to a probation report and thereafter incorporated them into a motion for a new trial. It stated that prior to trial defense counsel had no knowledge there could be any connection between the gun used in the Saulmetellus shooting and the shooting of one Ben Drake by Ronald Coleman and John Coleman. One document, a report by Officer Maier, follows:

"In reading the reports on the METELLUS murder it was noted that the victim was shot with a .25 cal. weapon, possibly an automatic. It was also mentioned that Johnny COLEMAN was mentioned in this shooting. It brought to mind that Ben DRAKE was shot by the COLEMAN brothers and the weapon used was a .25 cal. automatic which was NEVER RECOVERED. It might be well to have a ballistics test on the bullet recovered in the DRAKE shooting for a possible connection with the weapons."

From the defendant's post trial motion it would appear that Ronald and John Coleman pleaded guilty to the offense connected with the shooting of Ben Drake. The trial court ruled this document was not discoverable as it was a recording of the mental processes of a police officer.

In our opinion officer Maier's report contained more than investigative theories—it at least suggests the existence of facts highly relevant to Baltimore's guilt or innocence, and indicates several common denominators in the Saulmetellus and Drake shootings. The same caliber gun was used, and two of the Coleman brothers were convicted in the Drake shooting offense.

Defendant contends that he should have been allowed to cross examine Jimmy Coleman as to possible promises of leniency. The trial court refused to allow him to proceed. It is of particular significance that Jimmy Coleman charged with the theft of a black leather jacket was released from custody the day before he testified in the instant case.

■■■ While it is of course true that mere arrest cannot be used for impeachment, it was not Jimmy Coleman's alleged criminal activity generally, but a black leather jacket particularly, that was relevant and material here. This materiality could be readily perceived, we think, after

the testimony of Montalvo and Coleman, and became more pronounced as the trial progressed. The State contends that the court was correct in refusing to allow the defense to inquire into this offense, as only evidence of infamous crimes may be used to impeach a witness. This court does not agree. In *People v. Beard* (1966), 67 Ill.App.2d 83, 214 N.E.2d 577, a remarkably similar case, the defendant was charged with murder by a gun and a witness Rubio testified as to the shooting; she had been arrested the day before the trial and released. The trial court refused to allow defense counsel to inquire as to her arrest the day before the trial. The court there stated on 579:

> "* * * Under Ill. Rev. Stat. 1961, ch. 38, secs. 587 and 734, a witness may be cross-examined for the purpose of destroying his credibility only where he has been convicted of an infamous crime. Infamous crimes include murder, rape, indecent liberties with a child, perjury, kidnaping, burglary, etc. Disorderly conduct is not such an infamous crime, and furthermore, Rubio had not been convicted of such an offense, but only arrested and held on a charge. In the case before us, however, it was not intended to discredit the witness generally, but only to bring out that she had been charged with a criminal offense in order to show that the witness might be coloring her testimony because of an offer of immunity or leniency in an independent proceeding, or because of the coercive effect of her detention. [Citations.] In the instant case the defendant wished to bring this evidence before the jury so that the jury could consider Rubio's testimony in the light of the fact that she was detained in jail by the People. In our opinion, the cross examination of Rubio was unduly restricted, and this ruling by the trial court was error."

In a recent case the Supreme Court of the United States in *Giglio v. United States* (1972), 405 U.S. 150, 31 L.Ed.2d 104, 92 S.Ct. 763, a case different factually from the instant matter, the court made this observation which is pertinent to this case:

> "* * * When the 'reliability of a given witness may well be determinative of guilt or innocence', nondisclosure of evidence affecting credibility falls within this general rule. *Napue v. Illinois* (1959), 360 U.S. 264."

The trial court inspected these documents prior to the testimony of defendant's witnesses, including his own and that of his aunt and uncle, that Baltimore had worn a long brown coat that night and did not own a black leather jacket or a gun. The importance of what Baltimore had been wearing that night prior to his surrender to the police, is highlighted by the cross-examination of defendant's uncle. He was asked "Isn't it a

fact, Mr. May, I had a telephone conversation with you and you said he changed his clothes?" The uncle responded: "No, that is a lie." A discussion in chambers indicates the uncle's statement had always been that Baltimore left home that evening wearing the long brown coat, that the trial judge thought it obvious the case would turn on identification of defendant at the scene and it had become apparent that one of the primary issues was whether defendant wore the long brown coat at the time or had changed clothes before surrendering himself to the police. For that reason, the trial judge said he would grant a mistrial unless it was agreeable that the prosecutor's misstatement be withdrawn and the jury informed the witness had previously stated defendant was wearing the long brown coat that night.

Baltimore testified before his uncle, saying he wore the long brown coat that night, and that Jimmy Coleman, John Coleman and Melvin Hughes all wore black jackets that night. He talked with Montalvo in the club about girls and drugs, and after it closed, he walked outside and saw Montalvo sitting in the car surrounded by people. Jimmy Coleman called him, and talked to him on the sidewalk. Coleman showed him a gun, saying "Hey man, let's take over these two dudes." Baltimore said he refused, saying: "No man, leave the mans alone." Coleman testified he went to the car, where Hughes was talking to the deceased, and called Baltimore over. Baltimore, Jimmy Coleman, Melvin Hughes, Junella Wilkins and Mary Simmons were all on the driver's side of the car when the shooting occurred. Defendant was talking to Mary Simmons and had his back turned to Saulmetellus when he heard a shot. The deceased lunged from the car and brushed against the defendant who turned and saw his male companions running down the street. He did not see who shot the deceased.

Withholding the two documents in question was error requiring reversal as there was a failure to comply with the constitutional requirement that the prosecution disclose evidence favorable to an accused where the evidence is material either to guilt or punishment. *Brady v. Maryland* (1963), 373 U.S. 83 at 87, 83 S.Ct. 1194 at 1196-7.

This requirement is now embodied in Supreme Court Rule 412(c) which requires disclosure of any information tending to negate guilt of the accused. We consider section (c) of the Rule more inclusive than the specific disclosures required in sections (a) and (b), and the Committee commented as follows:

> "Although the pretrial disclosure of such material is now not constitutionally required it is clear that, if a conviction is to be valid, the material must be disclosed so the defense can make use of it. In providing for pretrial disclosure this paragraph permits ade-

quate preparation for, and minimizes interruptions of, a trial, and assures informed pleas by the accused." S.H.A. Ch. 110A § 412(c), Committee Comments.

Prior to formulation of the rule, it was held in *People v. Murdock* (1968), 39 Ill.2d 553 at 560, 237 N.E.2d 442 that an accused was denied due process as a result of the prosecution's failure to disclose the existence of a statement material to the defense even though the person making the statement apparently was not called as a witness.

Having determined that the entire cause must be remanded, we now consider the second important issue raised by defendant which may foreseeably recur at a new trial.

Defendant claims the trial court erred in allowing in-court identification of defendant by Montalvo as there was no clear and convincing evidence it had an origin independent of an unnecessarily suggestive confrontation at the police station. Several hours after the shooting, Montalvo gave police a description of the assailant and selected his photograph out of a group of six. Someone then remarked "That's Willie Baltimore." Montalvo viewed the black defendant behind a one way mirror, and then was taken by an officer into the room where Baltimore and State's Attorney Hoogasian were present, and the defendant was required to stand and remove his coat and hat.

Montalvo's testimony at the trial was flawed by a language problem and an interpreter was used. The cumulative effect of it appears to be that he had doubt whether defendant was the same man he had seen in the small room at the police station as he said that man "so much young, this man more—he had more age" but he was quite sure defendant was the man he had seen in High Chapparal that night for an hour and a half, and on the driver's side of the car at the time of the shooting for seven to ten minutes. The scene was illuminated by various lights, including the interior car light.

■■■ In our opinion, the one-to-one confrontation at the police station in the presence of the State's Attorney combined with Montalvo's doubt of the identity of the man he viewed there would entitle defendant to exclusion of testimony of the station identification at a new trial if he so chooses, although he may not desire to invoke this exclusion if he considers the testimony more helpful than harmful. It was not error, however, to admit Montalvo's occurrence testimony as his opportunity to observe and identify defendant was sufficiently established in the record independent of any later view of him at the police station. Indeed, the occurrence testimony seems to result in spite of the confrontation at the police station rather than because of its influence or overriding suggestion.

Examination of the record herein discloses an error with regard to the jury's deliberation. This was not objected to in the trial court and as a matter of fact was consented to. Additionally, this matter was not raised in appellant's brief on appeal. Nonetheless, under Supreme Court Rule 615-A, Ill. Rev. Stat. 110A, sec. 615 (1969) this court will consider what we think is plain error affecting substantial rights of the accused.

At 1:35 in the afternoon the jury commenced its deliberations. At 12:25 the next morning the jury was returned to the court room and asked by the court if they could reach a verdict. The foreman replied in the affirmative. At 1:50 in the morning the jury was again asked by a note from the Judge as to how much additional time was required and the jury by note answered "One hour, please." At 3:00 in the morning the Judge received another note from the jury which stated "This jury has not reached a unanimous decision. We feel that such decision cannot be reached at any time." This note was signed by the foreman. At this time no further action was taken by the court but at 3:20 in the morning the court read to the jury I.P.I. civil instruction 1.05:

> "Any verdict you reach must be unanimous. And in your deliberations you should examine the questions submitted with a proper regard and consideration for the opinions of each other. You should listen to each other's arguments with an open mind, and you should make every reasonable effort to reach a verdict."

At 3:50 in the morning the court sent the following interrogatory in to the jury:

> "Are you able to reach a verdict of guilty or not guilty without regard to the question of the imposition of the death penalty?"

The jury then sent out a note

> "We are not apart on the death penalty."

At 4:22 in the morning the jury returned a verdict of guilty.

In *People v. Weinstein* (1966), 35 Ill.2d 467, 220 N.E.2d 432 the Supreme Court stated that errors not properly preserved in a criminal case should be considered by the court where the evidence is evenly balanced or where the nature of such errors may deprive the accused of his rights. This case was followed with approval in *People v. Brown* (1967), 83 Ill.App.2d 457, 228 N.E.2d 505 and in *People v. Erb* (1970), 128 Ill.App. 2d 126, 261 N.E.2d 431, 437, where we stated:

> "Plain errors or defects affecting substantial rights may be noticed although not brought to the attention of the trial court."

Examination of the record indicates that this was in fact a "close" case. In the opinion of this court, after many hours of deliberation, the submission to the jury of an interrogatory in which the court asked the jury whether they could reach a verdict of guilty or not guilty without regard

to the imposition of the death penalty may well have been misconstrued by members of the jury. The submission of this interrogatory to the jury was plain error under the facts of this case. In *Crabtree v. Hagenbaugh* (1860), 23 Ill. 349, after the jury retired, the Judge at the request of the jury went to the jury room and communicated with them regarding an instruction. The Supreme Court held this to be error and reversed.

In a civil case, *Chicago & Alton R.R. Co. v. Robbins*, (1895), 159 Ill. 598, 43 N.E. 332, the court received a note from the foreman of the jury and replied thereto through the bailiff. While the Supreme Court in holding that what the Judge stated was correct, after citing *Crabtree*, nonetheless reversed the case because of such communication. In *People v. Rohwedder*, (1967), 78 Ill.App.2d 211, 223 N.E.2d 1, the court in citing *Crabtree* held that the action of the Judge in calling the jury in, in the absence of the defendant and his counsel, would probably be interpreted as an inquiry to mean the Judge thought it was time they brought in a verdict.

Under the circumstances of this case we are of the opinion that the action of the Judge in sending in the above inquiries might reasonably be interpreted by members of the jury to indicate an opinion of the court as to defendant's guilt.

Considering all of the above, this court cannot say that this defendant has had a fair and impartial trial. This court recognizes the difficulties encountered by both the prosecution and defense with the varying stories of the witnesses. It was a lengthy trial lasting eight days and it is to be noted that the jury deliberated fifteen hours before reaching a verdict. The defendant has protested his innocence to the end. While he does have a criminal record he should have the same fair trial to which all citizens are entitled.

It is not necessary to this decision to rule on the remaining issues raised. We cannot reasonably predict the turn that examination and cross-examination may take in a new trial, and we limit ourselves to the suggestion that a more temperate final argument is appropriate.

Reversed and remanded.

SEIDENFELD, P. J., and T. MORAN, J., concur.

## SUPPLEMENTAL OPINION

Mr. JUSTICE GUILD delivered the opinion of the court:

■■ The State's petition for rehearing disputes our impression that conflicting facts appear in the record but we believe they do. Several other contentions, we think, are repetitious and were amply discussed in our opinion. One issue contained in the rehearing petition, however, merits

further discussion and concerns our consideration of the trial judge's interrogatory to the jury. Inasmuch as this point was not raised or argued by defense counsel on appeal, the State contends that this court is without power "to search the record for error." This court does not agree. The State is correct in stating that it is not the duty of the reviewing court to search the record for error. Many cases to this effect may be found. There appears to be a paucity of cases pertaining to the right of the reviewing court to do so. One of the reasons for this lack of decisions is the fact that the State cannot appeal such a ruling. However, this court feels that it has a perfect right to search the record for plain error to see that substantial justice is done to a defendant in a criminal case. In *Hux v. Raben* (1967), 38 Ill.2d 223 at 224, 230 N.E.2d 832, the court stated:

"A further word is appropriate, however, in view of the sweeping character of the attack on the judgment of the appellate court. The last sentence of Rule 341 [e] [7] of the rules of this court [36 Ill.2d 138], 'Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing', states an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court. The distinction clearly appears when that sentence is read in conjunction with Rule 366, which deals with the powers of a reviewing court and the scope of review. Rule 366 provides: '[a] Powers. In all appeals the reviewing court may, in its discretion, and on such terms as it deems just * * * [5] give any judgment and make any order that ought to have been given or made, * * *.' [36 Ill.2d 159]. A similar thought is expressed in the provision of Rule 615 with respect to the review of criminal cases 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' 36 Ill.2d 182.

These provisions recognize that the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system."

In *People v. Henderson* (1970), 119 Ill.App.2d 403, 256 N.E.2d 84, the defendant therein raised an issue in his reply brief which was not raised either at the trial or in his original brief. The court there stated at 405:

"* * * Despite the fact that this issue was first raised in defendant's reply brief, the rule is well established that in the interest of justice, a reviewing court may consider all questions which

appear to be plain error or affect substantial rights of a party."
* * *

See also *People v. Baldwin* (1937), 278 Ill.App. 327 at 333.

We therefore hold that under the provisions of the Criminal Code, (Ill. Rev. Stat. Ch. 38, Sec. 129-9 (a)), that plain errors affecting substantial rights of the accused may be considered by this court notwithstanding the fact that they were raised neither in the trial court nor in the appeal. As early as 1917 the Supreme Court of Illinois held that errors not brought to the attention of the Appellate Court would be considered by the Supreme Court. In *People v. Donahoe,* 279 Ill. 411, 414, 117 N.E.2d 105, 107, the Illinois Supreme Court stated:

> "* * * The rule is that alleged errors in the ruling of a trial court not argued or brought to the attention of the Appellate Court will be held to have been waived and abandoned and cannot be raised for the first time in this court. [*Dunn v. Crichfield,* 214 Ill. 292, 73 N.E. 386, and cases there cited.] This is not a hard and fast rule, and, where this court can see that the application of it would result in great injustice, it will not be blindly adhered to."

■■■ The basic principle of justice in the United States is that the defendant shall have a fair trial, and in this court's opinion the failure of defense counsel to raise an issue in the trial court or reviewing court should not necessarily deprive the defendant of that fair trial. It is the primary responsibility of defense counsel in a criminal case to bring reversible errors to the attention of a reviewing court, and as a practical matter, counsel's omission to do so will usually result in such point not being considered at all. This is not to say, however, that a reviewing court cannot consider plain error appearing in the record. In this case, the trial judge's interrogatory to the jury, combined with the length of the jury's deliberations, seems to us so patently connected with substantial justice to an accused as to require our consideration.

Petition for rehearing denied.

SEIDENFELD, P. J., concurs.

T. MORAN, J., dissents.