THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANTONIO MATOS TORRES, Defendant-Appellant.

First District (3rd Division)    No. 62494

Opinion filed March 23, 1977.

Lawrence Stephen Galka, of Chicago (Jack L. Uretsky, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago, (Laurence J. Bolon, Linda Ann Miller, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a bench trial the defendant, Antonio Torres, was found guilty of murder and sentenced to serve 15 to 18 years in the penitentiary. Defendant appeals and raises three issues: (1) that he was not proved guilty beyond a reasonable doubt; (2) that the trial court mistakenly interpreted the evidence; and (3) that the trial court wrongfully refused to consider the lesser included offense of manslaughter. We find it unnecessary, however, to reach defendant's contentions and, instead, reverse and remand based upon the trial court's error in denying defendant's post-trial motion for a new trial. We, therefore, refrain from any comment upon defendant's guilt, and limit our discussion of the evidence adduced in this case to those facts pertinent to our decisions today.

On July 20, 1973, defendant, Antonio Torres, his wife, Jennie Torres, and their five children lived in the second-floor apartment at 3353 West Crystal, Chicago, Illinois. The landlord, Paul Mendez, who lived in the first-floor apartment, was in the process of evicting them. At approximately 11:15 a.m. on that day, defendant shot Mendez. As a result of the wounds inflicted, Mendez died four days later, on July 24, 1973. Defendant was charged with murder, waived a jury, and the matter was tried before the bench. Defendant does not deny shooting the deceased, but claims that the shooting constituted justifiable homicide in defense of another person, his wife, under section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1).

Initially, the parties stipulated to the coroner's "Pathological Report and Protocol", which was admitted into evidence as people's exhibit No. 1. The report stated that: (1) the hospital surgeon's report indicated four bullet wounds; (2) the coroner's office recognized six bullet wounds, with four being entries and two exits, with two other deposits; (3) bullet

wound No. 1 enters the right chest-side, slightly anteriorly external of the chest cage, and has a directional course downward from approximately 11-12 to 5-6 o'clock and is deposited in the deep muscles posteriorly low gluteal or uppermost thigh; (4) bullet wound No. 2 is right chest-side, slightly anterior of wound No. 1, with a directional course downward towards 6 o'clock, and is deposited in the right aspect posteriorly of the low lumbar vertebral column; (5) bullet wounds No. 4 and No. 5 are in the left thigh area, exit respectively through wounds No. 3 and No. 6, and were caused by bullets of essentially adynamic status.

Officer Edward Kelly testified that he and his partner were called to the scene of the shooting on the day in question. They entered the first-floor apartment and found Mendez, the victim, bleeding on the kitchen floor. There were several bullet casings in the hallway and in the victim's living room. Mendez told Officer Kelly that "the man upstairs, Tony Matos" had shot him, and told him that defendant had left in a maroon Chevrolet station wagon with his wife. Mendez was then taken to the hospital, and Officer Kelly sent out a flash message on defendant and the car. As he entered the victim's apartment, Officer Kelly saw two hand axes; one was on the dining room table and one was on the floor. Neither ax was recovered or inventoried by the police.

Investigator Clyde J. Craig testified that he and his partner stopped a station wagon fitting the description in the flash message. Defendant and his wife were in the car. When asked for identification, defendant gave Investigator Craig a social security card bearing the name Antonio Torres. Investigator Craig asked the defendant if he was Antonio Matos and defendant answered no, that he was Antonio Torres, and that he resided at 3353 West Crystal. Defendant was arrested, advised of his constitutional rights, and subsequently taken to the emergency room of the hospital, where Mendez identified defendant as the man who shot him. Defendant was taken to Area 5 homicide headquarters and questioned about the shooting. Initially, he denied shooting Mendez, but after speaking with an Assistant State's Attorney, defendant admitted the shooting and remarked that he thought Mendez was attacking his wife.

On cross-examination it appeared that Investigator Craig's complete written report did not show that defendant ever denied the shooting; however, it did definitely show that during the questioning defendant stated that he thought Mendez was hitting his wife so he shot him.

An unidentified police officer testified that he spoke with the deceased at the emergency room and was told that he had been shot by his tenant, Mr. Torres. The deceased stated that he was in the process of evicting Mr. Torres, and that at the time of the shooting he was repairing some doors in the hallway.

Officer Richard Liss testified that he recovered defendant's weapon

from a brown box in the alley behind 3641 West Dickens. Defendant's wife showed him where the gun was hidden.

Investigator William Baldree testified that he spoke with defendant a number of times at Area 5 homicide headquarters, commencing at about 1-1:30 p.m. The first time defendant admitted the shooting was around 2:30-3 p.m. Defendant said he wanted Investigator Baldree to "have the right story." Defendant then stated that his wife had left their apartment and gone down the stairs, and that he followed soon after. He saw Mendez talking to his wife and he thought Mendez was going to hit her with an ax. Defendant took out his gun and fired rapidly until it was empty. He fired the shots "from the top of the stairs when he first came out and took maybe two steps down." On descent, the top five or six steps of the stairway face west, then the stairway turns north for five or six steps, and at the bottom the stairway again turns west. The gun was a Browning 9 m.m. automatic, and in order to fire until empty defendant would have to pull the trigger 13 times. Defendant never told Investigator Baldree that he fired any shots from the first-floor landing. Thirteen shell casings were recovered at the scene.

On cross-examination Investigator Baldree testified that defendant stated he was firing while coming down the stairs, and that defendant "claimed that all the shooting was done more toward the top of the stairs and none toward the bottom."

Antonio Matos Torres testified in his own defense. He was the only eyewitness who testified. On the day of the incident his wife had left their apartment and gone downstairs, and he followed a minute later. He heard Mendez angrily tell his wife "I'm going to kill you." Defendant was coming down the stairs when he first saw Mendez, who was perhaps a foot away from Mrs. Torres. Mendez was standing face to face with defendant's wife, his right side toward defendant, with an ax in his right hand raised over his head. Defendant yelled "stop." Mendez advanced toward Mrs. Torres and defendant panicked and fired until his gun was empty. He had started shooting as he was coming down the stairs, about "two or three steps from the top." At some point the victim fell down, but defendant could not recall when. Defendant admitted that the gun was his and stated that he was carrying it because it was a bad neighborhood. His wife was standing in a panicked state, and "just moved out the door." Defendant did not intend to kill Mendez, but wished to stop him and make him drop the ax. He just kept firing the gun rapidly. Defendant's wife had separated from him after the preliminary hearing in the case and he did not know where she was. She had been gone for eight months.

On cross-examination defendant could not recall whether he had told the police that Mendez had threatened to kill his wife. He started firing on the second step from the top of the stairs, panicked, and kept firing until the gun was empty one or two steps later. Mendez fell down after the last

shot. Defendant first stated that he thought Mendez dropped the ax when he fell, but then stated that Mendez crawled into his apartment with the ax still in his hand. Again defendant first testified that his wife left before he started firing, but then stated she was present and walked out during the firing. Defendant was shown people's exhibit No. 5, a photograph, which showed bullet holes around the door leading to the victim's apartment. He admitted he could not hit this area with shots from the very top of the stairs, but was not sure if one could do so from two or three steps down. He explained that while he was shooting he moved the gun to the side since he did not wish to kill Mendez, and perhaps this was when the bullets struck the door frame. Defendant denied that he started shooting while Mendez was fixing the front door and then chased him back as he crawled into his apartment, firing at him as he went. After the shooting, defendant left and hid the gun. Defendant could not recall how long it took him to mention the ax to the police, or to tell them he was acting in defense of his wife.

Upon redirect defendant testified that it only took a few seconds for the gun to empty. He did not know how many times he had hit Mendez.

Investigator William Baldree was recalled as a rebuttal witness. He testified that from the second stair from the top there is no line of fire for a bullet to take into the frame around the deceased's apartment.

After defendant was found guilty he filed a written motion for a new trial. Defense counsel stated that prior to the trial he had unsuccessfully attempted to locate defendant's wife, Jennie Torres. Subsequent to the trial, after impressing upon friends of the wife the seriousness of the situation, he obtained a New Jersey address. Through the New Jersey phone company he then obtained a phone number listed under a different name. Mrs. Torres was living in Paterson, New Jersey, under the name of Jennie Navedo. Counsel had spoken to her and she had agreed to return to Chicago to testify in the event a new trial was granted. It was counsel's contention that Mrs. Torres' testimony would corroborate her husband's and might have made a difference in the verdict. As examples of what her testimony would be, counsel attached copies of her testimony at the preliminary and bond hearings. At the hearing on defendant's motion, the State admitted that the wife's testimony was substantially the same as defendant's but argued that such evidence would merely be cumulative in nature and that the sequence of events still defied logic. Hence, her testimony would not alter the finding of guilt. The court denied defendant's motion.

■■ While defendant has not raised the issue on appeal, we find that it was error for the trial court to deny his motion for a new trial. The rule that "[p]oints not argued are waived * * *" embodied in Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1973, ch. 110A, par. 341(e)(7)), "states an admonition to the parties, not a limitation upon the jurisdiction of the

reviewing court." (*Hux v. Raben* (1967), 38 Ill. 2d 223, 224, 230 N.E.2d 831, 832.) Plain errors affecting substantial rights of the accused may be considered by the reviewing court notwithstanding the fact that they were not raised in the appeal. (See *Hux v. Raben; People v. Stickler* (1975), 31 Ill. App. 3d 726, 334 N.E.2d 471; *People v. McCollough* (1972), 8 Ill. App. 3d 963, 291 N.E.2d 505, *rev'd. on other grounds*, 57 Ill. 2d 440, 313 N.E.2d 462 (1974), *appeal dismissed*, 419 U.S. 1043, 42 L. Ed. 2d 637, 95 S. Ct. 614; *People v. Baltimore* (1972), 7 Ill. App. 3d 633, 288 N.E.2d 659; Ill. Rev. Stat. 1973, ch. 110A, pars. 366(a)(5) and 615(a).) In addition, our supreme court has held that in criminal cases in which the evidence is closely balanced the reviewing court may consider errors that have not been properly preserved for review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) We consider the instant appeal to be such a case as to require invocation of the plain error rule.

■■ We recognize that applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288; *People v. Pruitt* (1974), 16 Ill. App. 3d 930, 307 N.E.2d 142, *cert. denied*, 419 U.S. 968, 42 L. Ed. 2d 184, 94 S. Ct. 232.) The general rule is that in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, such application should be subjected to the closest scrutiny; the burden is on the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence; and the exercise of discretion in denying such an application will not be disturbed except in the case of manifest abuse. (*People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338; *People v. Howze* (1972), 7 Ill. App. 3d 60, 286 N.E.2d 507.) To award a new trial, the new evidence must be of such a character that it will probably change the result on retrial, must be material to the issue and not merely cumulative, and must be of such a nature that it could not have been discovered prior to trial by the exercise of due diligence. (*People v. Holtzman; People v. Allen* (1976), 35 Ill. App. 3d 342, 341 N.E.2d 431.) These rules, however, are based on public policy which looks to the finality of trials, and are not absolute guides for the trial court. (*People v. Hughes* (1973), 11 Ill. App. 3d 224, 296 N.E.2d 643.) Where the newly discovered evidence is not cumulative and is of such a nature as to strengthen the conviction that justice has not been done, a new trial shall be granted. See *People v. Fisher* (1922), 303 Ill. 594, 136 N.E. 496; *People v. Hughes*.

The particular facts and circumstances in the record before us make this an appropriate case in which to grant a new trial to further the ends of justice. Defendant claims that his shooting of the deceased constituted

justifiable homicide in defense of his wife. (Ill. Rev. Stat. 1973, ch. 38, par. 7—1.) This is an affirmative defense (Ill. Rev. Stat. 1973, ch. 38, par. 7—14), and once properly raised by some evidence of all the elements of the defense, it must be overcome by proof beyond a reasonable doubt to sustain the conviction. Ill. Rev. Stat. 1973, ch. 38, par. 3—2.

■■ The State's proof in the instant case was composed entirely of circumstantial evidence. While no legal distinction exists between direct and circumstantial evidence as to the weight and effect thereof (*People v. Robinson* (1958), 14 Ill. 2d 325, 153 N.E.2d 65; *People v. Gorsuch* (1974), 19 Ill. App. 3d 60, 310 N.E.2d 695), the rule is that to support a conviction based on circumstantial evidence, the facts produced must not only be consistent with defendant's guilt, but they must also be inconsistent with any reasonable hypothesis of innocence. (*People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 735; *People v. Magnafichi* (1956), 9 Ill. 2d 169, 137 N.E.2d 256; *People v. Harris* (1975), 34 Ill. App. 3d 906, 340 N.E.2d 327, *cert. denied*, 429 U.S. 1002, 50 L. Ed. 2d 614, 97 S. Ct. 534 (1976).) Such proof, however, need not be beyond the possibility of a doubt (*People v. Branion* (1970), 47 Ill. 2d 70, 265 N.E.2d 1, *cert. denied*, 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213 (1971), *People v. Harris*), and the rule does not contemplate that the trier of fact is required to search out a series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt. (*People v. Huff* (1963), 29 Ill. 2d 315, 194 N.E.2d 230; *People v. Luckey* (1975), 35 Ill. App. 3d 179, 341 N.E.2d 112.) Nonetheless, in cases such as the instant one, where defendant is the only eyewitness to testify, the sufficiency of evidence to disprove defendant's theory can be a difficult issue. See *People v. Liddell* (1975), 32 Ill. App. 3d 828, 336 N.E.2d 815.

The State's theory at trial was that defendant came down the stairs from his apartment and saw the deceased on his hands and knees fixing the front door. Defendant opened fire upon the deceased from the bottom of the stairs, chased him back into his own living room where the fatal shots were fired, and then proceeded to flee the scene. Certain evidence might seem to support such a theory, including the location of bullet holes around the victim's apartment door, the location of shell casings in the victim's living room, the firing of 13 shots, and the inconsistencies in defendant's own testimony. Yet, certain other evidence raises uncertainties regarding the occurrence. The bullet holes near the victim's door could be explained if defendant was more than two steps down from the top of the stairs. In addition, the "Pathological Report and Protocol" indicated that of the four bullets that struck the deceased, only two of them struck him directly. These two bullets entered from the right side and followed an extremely downward trajectory on an anterior to

posterior course.[1] These facts seem more consistent with defendant's statement that he shot at defendant from high up the stairs, rather than shooting on an almost level plane from either the bottom of the stairs or in the deceased's living room. While we do not herein conclude that the trial court was unable to resolve the uncertainties raised by such evidence beyond a reasonable doubt, considering all the testimony and the permissible inferences therefrom, the case was a close one in our view. Therefore, the testimony by Mrs. Torres in corroboration of that given by defendant could change the result if a new trial were granted and no additional evidence of guilt was adduced by the State. See *People v. Pirovolos* (1970), 126 Ill. App. 2d 361, 261 N.E.2d 701. See also *People v. Hughes* (1973), 11 Ill. App. 3d 224, 196 N.E.2d 643; *People v. Upshaw* (1965), 58 Ill. App. 2d 256, 207 N.E.2d 728.

■■ The testimony by Mrs. Torres would not be merely cumulative in nature. We have reviewed her previous testimony and, in addition to corroborating defendant's version of the incident, we note that Mrs. Torres' testimony at trial would also bring forth certain details not previously testified to by defendant. Particularly, she could testify as to certain threats allegedly made to her by deceased at a prior time on the day of the shooting, could relate in detail the actions and words of the deceased in allegedly coming at her with an ax in the hallway, and could aid in clarifying defendant's inconsistent testimony concerning his wife's actions once the shooting started, *i.e.*, at what point she exited through the front door. If new evidence is of a different character and proves new and independent facts, it is not cumulative. *People v. Lacey* (1930), 339 Ill. 480, 171 N.E. 544.

Defense counsel had made extensive inquiries concerning the whereabouts of Mrs. Torres, but was unable to locate her until after the trial. She was living in New Jersey under a different name.

The evidence in the instant case is close, and Mrs. Torres is the only other person who could shed light upon the occurrence in question. Under such circumstances, and considering the gravity of the offense with which we are concerned, she should be allowed to testify. Consequently we believe that the interests of justice demand that we remand the cause for a new trial.

Reversed and remanded.

McNAMARA and McGLOON, JJ., concur.

---

[1] Defendant is apparently correct in his claim that the trial judge mistakenly interpreted the "Pathological Report and Protocol", as evidenced by the following statement made by the court during the defense summation:

"How do you account for the fact that the bullet did not go—This dead man was a short man. According to the defendant's testimony he shot 20 steps high.

All the bullets would have been transcending down into this man's body instead of going directly into his body. If he is up on a stairway and he shoots down at a guy, the bullets are all going to be going down."