THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH WILLIAMS, Defendant-Appellant.

First District (1st Division)   No. 83—563

Opinion filed January 6, 1986.

Howard Pomper & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Mary Ellen Dienes, and Kevin J. Cawley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:

After a jury trial, defendant Kenneth Williams was found guilty of rape and unlawful restraint and sentenced to concurrent terms of imprisonment of 16 years for rape and three years for unlawful restraint. On appeal, defendant contends (1) the trial court erred in denying his motion to quash his warrantless arrest, (2) the motion to suppress evidence should have been granted because the search was conducted without a warrant and without consent, (3) he was not proved guilty beyond a reasonable doubt, (4) blacks were systematically excluded from the jury, (5) the jury was instructed improperly, and (6) the sentence for rape was excessive.

At trial, the complainant testified that at about 3:30 a.m. on September 1, 1980, she went for a walk and was abducted at gunpoint in the vicinity of 1106 West 63rd Street in Chicago. A man whom she identified as defendant told her he would kill her if she screamed and forced her to walk through a vacant lot and alley to a stairwell of a building. The stairwell was wet and muddy because it had rained that evening. Defendant told complainant to undress, and when she refused, defendant threatened to kill her.

Defendant had anal and vaginal intercourse with complainant. Complainant was forced to stay in the stairwell for 15 minutes. During this time, defendant said he was a security guard and showed complainant handcuffs and a badge.

Defendant thereafter led complainant from the stairwell at gunpoint, and they walked down the alley for about two blocks until they reached a gray garage. A lawn mower was inside the garage, and carpeting and some pillows were on the floor. Defendant ordered complainant to undress again and threatened to kill her when she refused. After complainant obeyed defendant's order, he forced her to have intercourse with him. After complainant dressed, defendant walked her to the alley and told her she could leave. Complainant walked to 59th Street and Racine, where she hired a taxi to drive her to her boyfriend's house. At about 10 a.m., complainant went to St. Bernard's

Hospital, where she spoke to police and medical personnel. Complainant was treated, and the hospital staff performed several tests on her concerning the incident.

Complainant further testified that at 11:55 p.m. on September 1, 1980, she viewed a lineup at the police station. She identified defendant from the lineup of five people. At the time of the incident, defendant was wearing a white, short-sleeved shirt, a brown vest, dark pants and white gym shoes with black stripes. A patch of a McDonald's logo was sewn to his shirt sleeve.

Victor Jones, complainant's boyfriend, testified he saw the complainant at about 5 a.m. at his home at 7944 South Chappel. Complainant was crying, and her clothes were dirty, muddy, wet and torn. She said she had been raped in the vicinity of 63rd Street by a man who forced her into an alley and a garage. She said the man was wearing dark pants and a shirt with a McDonald's patch or security guard emblem sewn on the sleeve. She further told Jones that the man had handcuffs, a weapon, and a badge and told her that he was a security guard. Complainant took a shower, changed clothes, and called her mother. She took a cab home.

Officer Robert Williams of the Chicago police department testified that he spoke to complainant at St. Bernard's Hospital at 9:30 a.m. on September 1, 1980. He thereafter went to 1106 West 63rd Street to a vacant lot which complainant had described. He went through the lot to an alley and examined the stairwell of a building adjacent to the alley. He observed mud, debris and gym shoe prints in the stairwell. Complainant described the offender as a black male, approximately 20 to 25 years old, wearing a dark vest, white short-sleeved shirt with a McDonald's emblem on the sleeve, dark pants and white gym shoes with black stripes. She told Officer Williams that a man approached her on the street, put a gun to her side and forced her through an alley and into a stairwell. She was raped in the stairwell, taken to a garage and raped again there.

Officer Andrew Jones testified that he interviewed complainant at St. Bernard's Hospital on September 1, 1980. Complainant gave a description of the offender and told where the incident took place. Jones and his partner looked for the location of the offense. In the stairwell where the offense occurred, Jones saw gym shoe prints in the mud. The officers then went to a garage about two blocks away in the 6000 block of South May, where complainant stated she had also been taken. The officers entered the yard through an open gate and looked into the garage through the open garage door. Jones observed a lawn mower and a carpet in the garage. The officers spoke to defendant, and

defendant said he lived in the house at that address and that his grandmother parked her car in the garage. Defendant accompanied the officers to the garage and gave them permission to enter the garage. Jones identified a photo of the garage depicting carpeting, pillows, a lawn mower, boxes, and plywood on the garage floor. They returned to the hospital because they needed a more detailed description of the defendant. After they spoke to complainant again and obtained additional information, they returned to the South May address. Defendant was not present, but his aunt allowed the officers to enter the house and instructed defendant's brother to take them to defendant's room in the basement. Defendant's brother showed the officers defendant's bed. Alongside the bed were clothes which matched the description of the clothes complainant stated her assailant wore at the time of the offense. The officers saw a white shirt with a McDonald's emblem sewn on the sleeve, a brown vest, and a pair of black and white gym shoes. The shoes were wet and muddy. The officers recovered and inventoried the clothing. Defendant's aunt told police that defendant was at his girlfriend's house. The officers proceeded to the friend's house and spoke to her mother. Defendant was not there. The officers waited three to four hours for defendant to return, but were relieved by Officer Junkins.

Officer Clarence Junkins, one of the arresting officers, reviewed Jones' report and phoned defendant's girlfriend's aunt, Mrs. Sharpe. Mrs. Sharpe phoned the officers at about 8:30 p.m. and said defendant was at her home. The officers arrested defendant at Sharpe's home. They advised defendant of his rights and recovered a pair of handcuffs, two handcuff keys, and a special police badge during a pat-down search. Mrs. Sharpe admitted the police into her home. Police never drew their weapons.

Detective Dennis Bolda talked to defendant at the police station at about 9 p.m. on September 1, 1980. He advised defendant of his rights and the reason why he was in custody. Defendant denied knowledge of the incident. Defendant stated he was employed at McDonald's at Madison and Wells. Bolda conducted the lineup that evening at which complainant identified defendant. At 11 p.m., defendant was interviewed by Assistant State's Attorney Moran in the presence of Detective Bolda. Moran advised defendant of his rights. When Bolda told defendant he had been identified by the complainant, defendant still denied any knowledge of the incident. He said he had spent the evening with his girlfriend and had taken her home at 11 p.m. He went to a bar until about 2 a.m. and then to a restaurant with two of his friends Butch and Kevin. He arrived at home at 3 a.m. and went to bed. Bolda

contacted Denise Cargill, defendant's girlfriend, who said defendant was with her until midnight. Defendant's grandmother said defendant arrived home about 2:40 a.m. and went directly to bed. Bolda and Moran spoke to defendant again at 11:30 p.m., and Bolda told him they had recovered the clothing from his home. Defendant then confessed and said he had had intercourse with complainant in the stairwell and in the garage. On cross-examination, Bolda testified that Victor Jones told him he did not believe complainant had been raped, but that she was merely trying to get sympathy from him because of the fight they had had earlier that evening. Police did not recover the clothing worn by complainant at the time of the incident.

Dr. Dennis Malecki, an emergency room physician at St. Bernard's Hospital, testified he examined complainant on September 1, 1980, at 11 a.m. Complainant said she had been sexually assaulted and was seeking medical treatment. Dr. Malecki took vaginal and rectal smears and placed the slides in an evidence envelope. James Van Tillburg, a microanalyst for the Chicago police department, analyzed the smears and testified that only the vaginal smear contained sperm.

Defense witness Rosa Lee Johnson testified that her son Butch, his friend Kevin, and defendant were in Butch's room until 2:30 or 3 a.m. on the morning of September 1, 1980. They went out to eat and returned at 3:15 a.m. Defendant left Johnson's home at about 4:30 or 5 a.m.

Robert Johnson testified defendant was at his home from about 10:30 p.m. on August 31, 1980, until 2:30 a.m. the following day when he, defendant and a friend Kevin went to a restaurant. They returned to Johnson's house and defendant left at about 4:30 a.m.

Denise Cargill testified she went to the movie with defendant on the afternoon of September 1, 1980. They returned to her home at about 5:30 p.m. At 6:30 p.m., police rang the doorbell, but would not identify themselves when Cargill answered the door. They went into the kitchen where defendant was watching television, pulled defendant from the chair, and searched him. Police found a wallet and some change. She did not see them take a badge from defendant.

Defendant's brother Terry Williams testified that police searched the bedroom he shared with his brother. They took his gym shoes and defendant's suit, pants and vest. He further stated that the gym shoes, shirt and pants introduced into evidence by the State were not those taken by the police officers from his bedroom on the day in question. Defendant never possessed handcuffs or a special police badge. The vest which police took from his home was not part of his brother's McDonald's uniform, but was from a three-piece suit. He never told police

he let his brother wear his shoes on the evening in question.

Defendant testified he worked at McDonald's during April and May, 1980, and returned his uniform when he received his last paycheck. He had never seen the gym shoes, the handcuffs or the badge introduced into evidence by the State. The brown vest was part of a three-piece suit bought for him by his mother. On August 31, 1980, he visited his friend Butch and was with Butch and another friend Kevin until about 4:30 or 5 a.m. on September 1, 1980. He was wearing blue jeans, a yellow T-shirt, and black street shoes. Later that day, he went to the movies with his girlfriend Denise and was arrested at her home that evening. Police entered Denise's home and told him he was wanted for questioning. They did not recover handcuffs when they searched him. Defendant denied that he confessed to the offense.

Jessie Williams, defendant's grandmother, testified defendant arrived home at 4:30 a.m. on September 1, 1980. The gym shoes introduced into evidence never belonged to defendant. The vest was part of a suit she bought him, and the shirt was too small for defendant and never belonged to him. Defendant never owned handcuffs or a gun.

In rebuttal, the State called Assistant State's Attorney Jack Moran. Moran testified he spoke to defendant on the evening of September 1, 1980. He advised defendant of his rights and of the reason he was being detained. Defendant denied involvement in the offense and said he had been with his friends until 3 a.m., when he arrived home. After investigating further, Moran again spoke with defendant. He told him his alibi had not been corroborated and explained that defendant had been identified in a lineup and that evidence seized from defendant was reportedly used and seen during the commission of the offense. Defendant then confessed. Defendant told Moran that he had raped complainant in a stairwell and in a garage. When Moran showed him the handcuffs and badge, defendant said that they belonged to him and he owned them because he had always wanted to be a policeman. Defendant also told Moran he had worked at McDonald's.

As stated previously, defendant raises several issues on appeal. Defendant first contends the trial court erred in denying the motion to quash his arrest and suppress evidence resulting from the search conducted pursuant to his arrest because the warrantless entry into the home of a third person to effectuate the arrest was not accompanied by exigent circumstances.

Defendant relies on *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, and *United States v. Steagald* (1981), 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642, in support of his argument that his arrest in the home of a third person was illegal.

However, the cases relied on by defendant are distinguishable. In *Payton*, the issue concerned a warrantless arrest in the suspect's own home and the court, in holding that such an arrest was illegal, emphasized the privacy and sanctity of the individual's residence. In *Steagald*, law enforcement officers entered the home of a third person to arrest a suspect named in an arrest warrant. Their warrantless search made without the owner's consent uncovered evidence which was used to convict the owner of the home. The owner challenged the legality of the search. The court held that the search was illegal and again emphasized the homeowners privacy interest in being free from an unreasonable, warrantless search of his home. On the other hand, here, defendant had no privacy interest to be protected, as did those challenging the searches in *Payton* and *Steagald*. Instead, those whose home was entered by the police were those with a protectable interest. Thus, we question whether defendant has standing to contest the warrantless entry.

■ Even assuming that defendant had standing, we nevertheless find that the arrest was valid because consent to enter the home was given by Mrs. Sharpe. Under the principles enunciated in *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367, the fourth amendment is not violated where an arrest in the home of a third person is based on probable cause and consent to enter is given by one with authority over the residence. Probable cause is defined as knowledge of facts and circumstances sufficient to warrant a man of reasonable caution to believe an offense had been committed and the accused had committed the offense. *People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605.

■ In reviewing the trial court's ruling, we may consider testimony presented at both the pretrial hearing and at trial. (*People v. Wade* (1979), 71 Ill. App. 3d 1013, 389 N.E.2d 1230.) The evidence adduced at the hearing and at trial was substantially the same and showed the arresting officers had probable cause to arrest defendant. The officers had a description of the offender and the clothing he wore at the time the offense was committed. They received information about the scene of the crime, and the garage at defendant's home matched that description. Clothing similar to that described by the victim was found at defendant's home. Furthermore, the evidence indicated that Mrs. Sharpe gave the officers permission to enter the home. The arresting officer testified that Mrs. Sharpe had phoned them to tell them defendant had returned and she admitted them when they arrived. Admittedly, Sharpe and Cargill testified they did not give police authority to enter the premises, but it is a function of the trial court to determine the credibility of witnesses and resolve conflicts in

evidence. *People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869.

Second, defendant contends the motion to suppress evidence seized from his home should have been granted because the search was conducted without a warrant and without consent. Defendant contends police gained entry through deceit by requesting to use the washroom, when instead they actually wanted to search defendant's room, and that consent to enter did not extend to a search of the bedroom.

Consent to search may be given by another possessing common authority over the premises. (*People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608; *People v. McGrew* (1984), 128 Ill. App. 3d 464, 470 N.E.2d 1157.) Consent must be voluntarily given (*People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608), and voluntariness is determined from the totality of circumstances. (*People v. Salgado* (1980), 83 Ill. App. 3d 653, 404 N.E.2d 432.) The findings of the trial court on a motion to suppress will not be reversed unless it is clearly erroneous. *People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869.

The evidence presented at the hearing and at trial reveal the following facts. Officers Bell and Jones testified that after they spoke with complainant the second time, they determined that defendant was a suspect. When they returned to defendant's home, his aunt, Kay Bush, gave them permission to enter the home and defendant's bedroom. Defendant's brother took the police to the bedroom which he shared with defendant. In the bedroom on the floor, the officers saw clothing which matched the description of that which complainant said her assailant wore. Defendant's aunt also gave the officers permission to take the clothing. Kay Bush, however, testified she gave the officers permission to use the washroom, but when she went into the basement bedroom, the officers were searching the room. Defendant's brother also testified that the officers searched the room without permission.

■ On the basis of this evidence, we find no reason to disturb the ruling of the trial on defendant's motion to suppress evidence seized from his home. Clearly, defendant's brother and aunt had common authority over the premises and, thus, could consent to the officer's entry. Although the testimony regarding whether consent was given is conflicting, it is the trial court's duty to determine the credibility. (*People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869.) Furthermore, the clothing was, according to the officers, in plain view and it matched the description given by the complainant. For these reasons, we find that the trial court properly denied defendant's motion.

■ Next, defendant contends he was not proved guilty beyond a reasonable doubt. He argues specifically that identification by complainant was uncertain because she did not mention facial hair in her

first description and never noticed scars on defendant's hands and thighs. He further maintains that her credibility was damaged by her confusion as to whether the assailant wore low or high cut gym shoes, the fact that the clothes taken from his room were not wet or muddy, and that a picture of the stairwell taken the day of the offense does not depict footprints.

Initially, we note that the identification was not made under suggestive circumstances or under circumstances in which complainant had an inadequate opportunity to view the accused and, thus, it cannot be characterized as vague and uncertain. (*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) Rather, the factors mentioned by defendant are generally considered discrepancies in detail which affect only the weight given to the testimony by the trier of fact. (See *People v. Bibbs* (1981), 101 Ill. App. 3d 892, 428 N.E.2d 965.) The relevant factor is the complainant's ability to positively identify the offender. (*People v. Nichols* (1975), 32 Ill. App. 3d 265, 336 N.E.2d 194.) The inability to recall a particular feature is a factor to be considered by the trier of fact in determining credibility. *People v. Shelby* (1984), 123 Ill. App. 3d 153, 462 N.E.2d 761.

■ Under the circumstances of this case, no reason exists to disturb the decision of the jury. Complainant had an ample opportunity to view defendant during the commission of the offenses. She positively identified him in a lineup conducted the same day as the offense, and she described clothing and property similar to that recovered by police during their searches of defendant. The facts relied on by defendant do not discredit complainant's testimony and were properly left for consideration by the jury, whose decision will not be reversed unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) Here, the evidence proves defendant's guilt beyond a reasonable doubt and thus, the jury's verdict should not be disturbed.

■ Defendant further contends that his sixth amendment right to a jury representing a fair cross-section of the community was violated where the prosecution excluded blacks from the venire through the use of peremptory challenges. We disagree. The constitution is not violated so long as there is not a showing of such exclusion in case after case and the jury pool represents a fair cross-section of the community. (*People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202; *People v. Woods* (1984), 122 Ill. App. 3d 176, 460 N.E.2d 880.) Defendant here makes no objections to the pool from which jurors were selected, nor does he argue exclusion of black jurors on a case by case basis. Therefore, we find no merit to defendant's argument.

■ Next, defendant contends the trial court erred in failing to instruct the jury that they were to decide whether defendant made the statement which the police officers said he made. However, defendant's failure to object to the instruction at trial and to include the issue in his post-trial motion results in waiver of the issue on appeal. *People v. Wilson* (1984), 123 Ill. App. 3d 798, 463 N.E.2d 890.

Even assuming that the issue is properly before us, we find *no* basis for reversal. In *People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618, the court held that it was harmless error to improperly instruct the jury on defendant's confession where the state did not rely heavily on the confession to prove guilt. Here, as noted above, the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt. Complainant's testimony, corroborated by the officers, was positive and credible, and defendant's guilt was proved regardless of the statements made to police. We therefore find defendant's contention to be without merit.

■ Finally, defendant contends the sentences imposed were excessive. It is well settled that sentencing rests within the sound discretion to the trial court, and its decision will be reversed on appeal only if it abuses its discretion. (*People v. Lipa* (1982), 109 Ill. App. 3d 610, 440 N.E.2d 1062.) A reviewing court can alter a sentence only if the sentence greatly diverges from the spirit of the law and is highly disproportionate to the offense. *People v. Baker* (1983), 114 Ill. App. 3d 803, 448 N.E.2d 631.

Rape is a Class X felony punishable by imprisonment of between 6 and 30 years. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(3).) In the case at bar, the record indicates that the trial court carefully weighed the factors presented to him before imposing the sentence of 16 years for rape. Because the sentence imposed is not highly disproportionate to the offense, we cannot say that the trial court abused its discretion. Accordingly, we affirm the sentences imposed.

For these reasons the judgment appealed from is affirmed.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.