THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LECURTIS JOHNSON, a/k/a Lee Curtis Johnson, Defendant-Appellant.

First District (1st Division) No. 85—631

Opinion filed September 29, 1986.

Steven Clark and Sue Augustus, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Paula M. Carstensen, and William T. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, LeCurtis Johnson, was convicted of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2), and sentenced to a term of 10 years in the Illinois Department of Corrections. On appeal, defendant contends that: (1) the trial court erred in admitting into evidence shotgun shells found in his apartment; (2) the cumu-

lative effect of improper prosecutorial comments during closing argument denied him his right to a fair trial; (3) the trial court abused its discretion in sentencing defendant to 10 years' imprisonment; (4) the trial court erred in denying defendant's motion for a new trial predicated on newly discovered evidence; and (5) the State's discriminatory use of peremptory challenges violated defendant's constitutional rights. For the reasons that follow, we affirm in part and remand for an evidentiary hearing on the issue of the State's use of peremptory challenges.

The record sets forth the following facts pertinent to this appeal. On Friday, May 6, 1983, approximately 4:45 p.m., Janet Majcher, salesclerk at Wieboldt's Department Store, River Forest, was robbed at gunpoint of approximately $1,000 in cash and checks while carrying the currency from the basement Budget Department where she worked to the third-floor Customer Service Department. Janet testified that while walking up the stairs between the first and second floors at Wieboldt's, she heard footsteps behind her, turned around and saw defendant, who was wearing dark pants and a burgundy shirt. Janet then continued going up the stairs until defendant ordered her to stop and to put the bags that she was carrying into his gym bag. When Janet refused, defendant pulled out a gun and clicked the trigger. At that point, Janet dropped her packages into defendant's gym bag; and defendant turned and ran down the stairs. Janet estimated that the entire confrontation lasted approximately three minutes. The stairwell was brightly lit and was open between the floors. After defendant fled, Janet began to yell for help and ran to the third floor.

At trial, Janet identified the photo on an identification card from the First Bank of Oak Park, bearing the name LeCurtis Johnson, as depicting the man who had robbed her in the stairwell. When shown the same card by a police officer immediately after the robbery, Janet had also identified the photo. Janet further stated that on the following Monday, May 9, 1983, she and another Wieboldt's employee viewed a lineup at police headquarters where she again identified defendant as the perpetrator.

Next, Sylvia Mickles, a Wieboldt's employee, testified that on Friday, May 6, 1983, approximately 4:45 p.m., she was working in an area located near the third-floor stairwell when she heard someone scream from the stairwell, "Stop, help me." When she walked over to the stairwell landing, she saw Janet and defendant standing on the stairs between the second and third floors. She had a clear, unobstructed view of both of them. Defendant looked up and saw Sylvia, then grabbed the packages from Janet and ran down the stairs.

Sylvia further testified that earlier that day she had seen defendant twice at the customer-service desk on the third floor. The first time he had been filling out a charge application and the second time he was sitting across from the cashier's department. After the robbery, when the police showed her a photo bank identification card, she identified the photo of defendant as the man she had seen in the stairwell. Sylvia further testified that at a lineup on Monday, May 9, 1983, she again identified defendant. At trial, Sylvia identified defendant for the third time. On cross-examination, Sylvia stated that she had not seen a gun in defendant's hand, but that she had seen the gym bag.

Kathy McBride, a Wieboldt's employee, next testified that on May 6, 1983, she was walking by the third-floor stairwell when she heard a commotion, looked down and saw Janet and defendant. Defendant was wearing a burgundy shirt and pointing a gun at Janet. The stairwell was brightly lit. When defendant saw Kathy looking at him, he ran down the stairs. At a lineup held at the River Forest police department on May 9, 1983, Kathy identified defendant as the man she had seen in the stairwell with Janet.

Henry Beau, Wieboldt's store manager, next testified that on May 6, 1983, approximately 4:45 p.m., he was alerted that there had been a holdup. After calling the police, Beau proceeded to the stairwell where he found a photo bank identification card on the landing. He then ran out to the parking lot where he handed the identification card to one of the police officers who had arrived on the scene.

Next, Irene Rindone, a Wieboldt's employee, testified that on May 6, 1983, she was walking up the Wieboldt's stairwell when she heard a commotion and a man ran past her down the stairs. She then heard something drop in front of one of the elevators, turned and found a 12-gauge shotgun shell which she gave to a security guard. On cross-examination, Irene stated that she had not actually seen the bullet drop.

Officer Charles Schauer of the River Forest police department then testified that on May 6, 1983, after talking with witnesses to the robbery and receiving the bank photo identification card, he returned to police headquarters where he conducted an investigation to obtain defendant's address and a description of his automobile. Accompanied by another officer, Schauer then drove to defendant's address where he met officers from the Oak Park police department and set up surveillance.

Approximately 4:15 a.m. the next morning, defendant arrived at the building accompanied by another male. After being buzzed into the apartment building hallway, one of the officers began talking to defendant through his apartment door, telling him to come out. Eventually,

defendant and his friend came out into the building hallway where they were arrested. When one of the officers looked inside the apartment to see if anyone else was there, he saw a shotgun shell lying on the floor approximately 10 feet from the door and recovered it. Subsequently, the officers obtained a search warrant for defendant's apartment and his automobile where they found a burgundy shirt, nine live 12-gauge shotgun shells and a Wieboldt's credit application.

Following the completion of the State's case, defendant's motion for a directed verdict was denied. The court sustained defendant's objection to the introduction into evidence of the shotgun shell found at Wieboldt's, but overruled his objection to the introduction into evidence of the shotgun shells found in defendant's apartment.

Regina Johnson, defendant's wife, then testified that on Friday, May 6, 1983, defendant arrived to pick her up from work approximately 4:30 p.m. and waited for her for approximately one-half hour. After doing some errands, defendant drove her to her mother's house where she spent the night. She did not hear from defendant until 5 a.m. the next morning when he called to tell her that he had been arrested.

Next, Howard Baker, Regina Johnson's employer, testified that defendant regularly picked up his wife at work every Monday through Thursday at 4 p.m. and on Fridays between 4:30 p.m. and 5 p.m. On cross-examination, Baker testified that the Lake Street on which his company was located was the same Lake Street that ran through River Forest and Oak Park. Although he could not specifically recall the afternoon of Friday, May 6, 1983, Baker stated that defendant must have picked up his wife between 4:30 p.m. or 5 p.m. that day because he picked her up every Friday at that time. When queried about Monday, May 9, 1983, Baker insisted that defendant had picked up his wife that day based on the fact that it was his practice. The State then reminded Baker that defendant had been in police custody that day. Following deliberations by the jury, defendant was found guilty of armed robbery.

Approximately six weeks following completion of the trial, defendant filed a motion for new trial based, *inter alia*, on newly discovered evidence. Specifically, defendant alleged that his cousin, Dwight Johnson, had confessed to the crime for which defendant had been convicted. At the hearing on the motion, Dwight Johnson testified that on May 6, 1983, approximately 4 p.m., while wearing defendant's burgundy shirt and carrying his gym bag, he went to Wieboldt's Department Store in River Forest and robbed Janet Majcher at gunpoint in the store stairwell. Dwight further stated that prior to the conclusion

of defendant's trial, he had not told anyone what he had done and had not come forward earlier because he did not think defendant would be charged. However, when he learned of defendant's conviction from defendant's mother, Dwight told her he had committed the robbery.

On cross-examination, Dwight admitted that, in 1979, he had been convicted of "a couple of retail thefts" and theft from a person for which he was placed on three years' probation. In addition, at the time of his testimony, he had two attempted-murder cases pending against him for which he had been offered 12 years' imprisonment if he would plead guilty. Dwight further stated that after the Wieboldt's robbery, he returned to defendant's apartment, where he occasionally lived, and changed clothes.

Following closing arguments on the motion, the court stated that it did not have the "slightest doubt" that defendant was the person who had committed the crime, denied the motion for a new trial, and sentenced defendant to 10 years in the Illinois Department of Corrections. Defendant's appeal followed.

We first address defendant's contention that the trial court erred in admitting into evidence the shotgun shells which had been found in defendant's apartment on the ground that they were not relevant to any issue in the case. The State argues that defendant has waived this issue for review by his failure to raise the objection with specificity in his post-trial motion. In the alternative, the State argues that if this court decides the issue was not waived, introduction of the shells into evidence was harmless error in light of the overwhelming evidence of defendant's guilt.

■■ It is well established that the failure to raise an issue in a post-trial motion following a jury trial constitutes a waiver of that issue on review. (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.) Pursuant to Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), the exception to the waiver rule arises only when plain error has occurred, *i.e.*, where the evidence is closely balanced or where the error was so great that the accused was denied a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.

■ In the present case, defendant's motion for new trial failed to allege any error regarding the introduction into evidence of the shotgun shells found in his apartment. As a result, we find that the issue has been waived for review. We note, however, that even if the issue had not been waived, introduction of the shells into evidence would not constitute grounds for reversal or new trial. Although we concur with defendant that the court erred in introducing the shells into evidence

(see *People v. Liapis* (1972), 3 Ill. App. 3d 864, 279 N.E.2d 368), in view of the three eyewitness identifications, the photo identification card and other corroborating evidence, we find that the introduction into evidence of the shotgun shells was harmless error. *People v. West* (1981), 102 Ill. App. 3d 50, 459 N.E.2d 599.

■ Next, defendant asserts that during closing argument, the State improperly related facts not in evidence and expressed its personal opinion as to the credibility of State witnesses. With respect to the first allegation, while discussing the fact that both Wieboldt's and Regina Johnson's place of employment were located on Lake Street, the State commented:

> "I submit to you that [that street] is the same Lake Street that leads to the Oak Park-River Forest store three miles away, just fifteen minutes by car, and the defendant was driving on that day."

Defendant argues that the aforementioned comment as to time and distance was improper and prejudicial because it went beyond the facts in evidence. Although a prosecutor may not refer to matters outside the record during closing argument, he may comment on the evidence and any reasonable inferences that can be drawn therefrom. (*People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945.) In the present case, the addresses of Wieboldt's and Regina Johnson's place of employment were facts in evidence. In addition, Regina's employer testified that the Lake Street on which his company was located and the Lake Street on which Wieboldt's was located were the same. Accordingly, we find that the State's comment regarding the proximity of the locations in terms of approximate travel time and mileage was a proper inference to be drawn from the evidence.

With respect to the State's comments on the credibility of its witnesses, the State commented:

> "I submit to you that the State's witnesses were credible and believable witnesses, and they were credible and believable witnesses, because they were telling the truth.
> * * *
> Her testimony was consistent, and it was honest, and it was believable, and its because she's telling the truth.
> * * *
> They told you the truth."

■ We find that defendant's failure to either object to the aforementioned comments at trial or to raise the issue in his post-trial motion has waived the issue for review. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Thomas* (1983), 116 Ill. App. 3d 216,

452 N.E.2d 77.

■ Next, defendant argues that in light of his background and the nature of the offense, the trial court abused its discretion in sentencing him to 10 years' imprisonment. Under Illinois law, absent evidence of an abuse of discretion, a reviewing court will not disturb a sentence that is within the statutory limits set for the particular offense involved. (*People v. Shumate* (1981), 94 Ill. App. 3d 478, 419 N.E.2d 36.) In the present case, defendant was convicted of armed robbery, a Class X felony which has a minimum sentence of 6 years and a maximum of 30 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3).) Defendant's 10-year sentence is well within the statutory limits. Thus, because defendant has failed to present sufficient evidence to demonstrate an abuse of discretion by the trial court, we affirm the sentence imposed. Further, with respect to defendant's passing reference to the fact that the trial court failed to state its reasons for the sentence, we find that defendant waived his right to a specific finding by his failure to request a statement of reasons from the court at the time of sentencing. *People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473.

■ Defendant next contends that the trial court erred in not granting his motion for a new trial based upon the exculpatory testimony of his cousin. At the evidentiary hearing on the motion, defendant's cousin, Dwight Johnson, confessed that he had committed the robbery at Wieboldt's on May 6, 1983, and had not told anyone until he learned inadvertently from defendant's mother that defendant had been convicted of the robbery. Dwight further stated that he had worn defendant's burgundy shirt and had carried defendant's gym bag while committing the robbery. On cross-examination, Dwight described some details of the robbery, denied having seen any persons other than the victim near the stairwell, and admitted that he had two attempted-murder cases pending against him.

It is well established that motions for a new trial based upon newly discovered evidence are not favored by the courts and will be subjected to the closest scrutiny. In arguing the motion, the burden is on the movant to rebut the presumption that the verdict is correct. Absent evidence of the trial court's manifest abuse of discretion, the trial court's determination will not be disturbed on review. (*People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199; *People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338; *People v. Torres* (1977), 47 Ill. App. 3d 101, 361 N.E.2d 803.) In Illinois, the standard for a new trial predicated upon newly discovered evidence is comprised of three elements: (1) the evidence must be of such conclusive character that it will probably change the result on retrial; (2) the evidence must be material to the

issue and not merely cumulative; and (3) the evidence must have been discovered since the trial and not have been discoverable prior to trial by the exercise of due diligence. *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.

In the present case, we need address no more than the first element. Based upon the photo, lineup and at-trial identifications of defendant by three eyewitnesses, the corroborating physical evidence, and the inconsistencies in Dwight Johnson's testimony, we conclude that the confession was not of such conclusive character as to probably change the result of the trial. Accordingly, we find that the trial court properly denied defendant's motion for a new trial.

Further, we find *People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398, *People v. Torres* (1977), 47 Ill. App. 3d 101, 361 N.E.2d 803, and *People v. Hughes* (1973), 11 Ill. App. 3d 224, 296 N.E.2d 643, relied upon by defendant, unpersuasive of his position on this issue. In *Molstad*, defendant and his codefendants were convicted of aggravated battery and criminal damages to property. Following conclusion of the trial, defendant moved for a new trial based on exculpatory testimony of the five codefendants who had refused to testify at trial on self-incrimination grounds. Noting that only one eyewitness had identified defendant as being present at the scene of the crime, the supreme court found, *inter alia*, that the evidence of the codefendants should be balanced against the sole eyewitness. In the present case, there were three eyewitnesses, each of whom identified defendant.

In *Torres* and *Hughes*, the motions for a new trial based on newly discovered evidence were granted because the close evidence in each case raised uncertainties of the respective defendant's guilt. In *Torres*, the court noted that defendant's murder conviction had been based solely upon inconclusive circumstantial evidence. Thus, the court granted defendant's motion so as to allow the corroborating testimony of his wife who had been impossible to locate until after the trial. In *Hughes*, defendant was convicted of robbing a grocery store. There was no eyewitness identification. Finding that there was uncertainty as to whether defendant was chargeable as a perpetrator, under accountability principles or under either theory, the *Hughes* court allowed defendant's motion for a new trial to introduce the testimony of a previously unavailable accomplice. Contrary to *Torres* and *Hughes*, there is overwhelming evidence in the present case as to defendant's guilt. Accordingly, we do not find that the trial court abused its discretion in denying defendant's motion for a new trial.

Finally, defendant contends that the State, by use of its peremptory challenges during *voir dire*, purposefully excluded blacks

from the jury, thereby depriving him of his constitutional right to be tried before a representative jury. Following the State's use of its first seven peremptory challenges to exclude six blacks from the jury, defendant requested a sidebar during which he raised the following objection:

"Your Honor, it is becoming increasingly clear *** that the practice of Ms. Spooner is not to have any Black folks on this jury. There is absolutely no reason in the world why Ms. Lusk should be excused as a juror. Here's a woman who teaches school, who is stable, owns her own home, her husband has been on the job for twenty years, and she has been on the job for nineteen years.

The only possible reason that the State could come up for excusing this woman is the fact that she is Black.

Every challenge that they have used except for one, every challenge has been against a Black person.

Now we're caught up in a situation where there are no Blacks left out there to pick from.

The defendant in this case is Black, and he certainly has a right to have Black folks on this jury."

In response, the prosecutor stated that she is black; there have been two blacks selected for the jury; and her exclusions of blacks from the petit jury had not been motivated by any prejudice or bias. The court ruled that, under Illinois law, absent evidence that State's Attorneys have systematically excluded blacks in previous cases, there is no ground for a constitutional violation. The court then denied defendant's motion for a mistrial. When jury selection resumed, the State used another peremptory challenge to exclude a black venireman.

At the time of defendant's trial, *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and its progeny governed the issue of discriminatory use of peremptory challenges. In *Swain,* the Supreme Court held that the use of peremptory challenges to exclude members of cognizable racial groups was not a violation of equal protection guarantees unless the defendant could establish the prosecutor's systematic exclusion of such persons in case after case.

Subsequent to the conclusion of defendant's trial and while this case was pending on direct appeal, the United States Supreme Court overruled *Swain's* requirement of a showing of systematic exclusion of blacks from the venire in *Batson v. Kentucky* (1986), 476 U.S. ____, 90 L. Ed. 2d 69, 106 S. Ct. 1712. In *Batson,* the court held that a defendant may establish a *prima facie* case of purposeful discrimination solely on evidence of the prosecutor's use of peremptory challenges to exclude members of his racial group at defendant's trial. To establish a

*prima facie* case, the defendant must satisfy a two-prong test: first, he must show that he is a member of a cognizable racial group, the members of which have been excluded from the venire as a result of the prosecutor's use of peremptory challenges; and, second, he must demonstrate that the discriminatory potential of peremptory challenges and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude veniremen from the petit jury on racial grounds. Once a defendant establishes a *prima facie* case of purposeful discrimination, the burden shifts to the prosecutor to come forward with a neutral explanation for excluding members of the defendant's racial group. *Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 77, 106 S. Ct. 1712, 1723.

In reaching its decision, the *Batson* court declined to direct the trial court as to what "relevant circumstances" should be considered in reaching a determination as to whether defendant had established a *prima facie* case of purposeful discrimination. Instead, the Supreme Court stated, "We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against Black jurors." (*Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 88, 106 S. Ct. 1712, 1723.) The court was similarly vague in describing the prosecution's burden of providing a "neutral explanation," limiting its direction to the statement that the explanation "need not rise to the level justifying exercise of a challenge for cause." (476 U.S. ___, ___, 90 L. Ed. 2d 69, 88, 106 S. Ct. 1712, 1723.) However, the court did state that the prosecution may not rebut defendant's *prima facie* case by explaining that persons in defendant's racial group had been excluded from the jury on the assumption that they would be partial to the defendant because of their shared race. 476 U.S. ___, ___, 90 L. Ed. 2d 69, 88, 106 S. Ct. 1712, 1723.

In addition, the Supreme Court declined to rule on the retroactive application of *Batson*. However, with respect to defendant Batson, the Supreme Court remanded the case for further proceedings on the ground that "the trial court flatly rejected [defendant's] objection [to use of peremptory challenges] without requiring the prosecutor to give an explanation for his action." (*Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 90, 106 S. Ct. 1712, 1725.) In concurring opinions, Justices White and O'Connor took the position that *Batson* was not to be applied retroactively. (476 U.S. ___, ___, ___, 90 L. Ed. 2d 69, 91, 97, 106 S. Ct. 1712, 1726, 1731.) Similarly, in their joint dissent, Chief Justice Burger and Justice Rehnquist concurred that

*Batson* should not be applied retroactively. (476 U.S. ____, ____, 90 L. Ed. 2d 69, 112, 106 S. Ct. 1712, 1731.) The remaining Justices made no comment on this issue. However, recently, in *Allen v. Hardy* (1986), 478 U.S. ____, 92 L. Ed. 2d 199, 106 S. Ct. 2878, a *per curiam* decision, the Supreme Court addressed the issue of retroactive application of *Batson* with respect to a petition for *habeas corpus* relief and held that *Batson* was nonretroactive on collateral review of convictions that became final before *Batson* was decided. The court specifically declined to express its view on whether *Batson* should be applied retroactively to cases that were pending on direct appeal when *Batson* was decided. (*Allen v. Hardy* (1986), 478 U.S. ____, ____ n.1, 92 L. Ed. 2d 199, 204 n.1, 106 S. Ct. 2878, 2880 n.1.) Currently, two cases which present the latter question and were granted *certiorari* are pending before the Supreme Court (*Griffith v. Kentucky* (1986), 476 U.S. 1157, 90 L. Ed. 2d 717, 106 S. Ct. 2274, and *Brown v. United States* (1986), 476 U.S. 1157, 90 L. Ed. 2d 718, 106 S. Ct. 2275).

■ Historically, the issue of retroactive application of a United States Supreme Court decision in criminal matters has been split along the lines of whether the case seeking retroactive application was pending on direct appeal at the time the Supreme Court decision was decided or whether the case was in the form of a collateral attack, *i.e.*, seeking *habeas corpus* relief. (*Allen v. Hardy* (1986), ____ U.S. ____, 92 L. Ed. 2d 199, 106 S. Ct. 2878; *Shea v. Louisiana* (1985), 470 U.S. 51, 84 L. Ed. 2d 38, 105 S. Ct. 1065; *Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338; *United States v. Johnson* (1982), 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579; *Tehan v. United States ex rel. Shott* (1966), 382 U.S. 406, 15 L. Ed. 2d 453, 86 S. Ct. 459; *Linkletter v. Walker* (1965), 381 U.S. 618, 14 L. Ed. 2d 601, 85 S. Ct. 1731.) In the present case, defendant's case was pending and on direct appeal in the State system at the time *Batson* was decided.

In *Linkletter v. Walker* (1965), 381 U.S. 618, 14 L. Ed. 2d 601, 85 S. Ct. 1731, the Supreme Court addressed the question of whether the fourth amendment exclusionary rule of *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, should be applied retroactively to State convictions that had become final before *Mapp* was decided. The *Linkletter* court concluded that limited retroactive application was appropriate. Thus, *Mapp* would be applied retroactively to cases still pending on direct review at the time *Mapp* was decided. However, retroactive application would not be appropriate with respect to convictions that had become final before *Mapp* had been decided. Similarly, in *Tehan v. United States ex rel. Shott* (1966), 382 U.S. 406, 15 L. Ed. 2d 453, 86 S. Ct. 459, the Supreme Court held that the fifth amendment

rule of *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229, which barred comment on a State defendant's failure to testify was retroactive to cases still pending on direct review at the time *Griffin* was announced, and nonretroactive to judgments of conviction made final before *Griffin*.

Several years later in *United States v. Johnson* (1982), 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579, the Supreme Court held that the decision of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, which held that the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest, was retroactive to all convictions not yet final at the time *Payton* was decided.

Shortly thereafter, in *Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338, a *habeas corpus* case, the court refused to retroactively apply *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, which held that once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him. By contrast, the following year in *Shea v. Louisiana* (1985), 470 U.S. 51, 84 L. Ed. 2d 38, 105 S. Ct. 1065, the Supreme Court held that *Edwards* applied retroactively to cases pending on direct appeal at the time *Edwards* was decided. *Shea* did not overrule *Solem*. Rather, there is an important factual distinction between the two cases. In *Solem*, there was a Federal collateral attack upon a State conviction which had become final. However, in *Shea* the case was pending on direct review at the time *Edwards* was decided. The *Shea* court noted that the concern that retroactive application will nullify convictions and "relegate prosecutors to the difficult position of having to retry cases concerning events that took place years ago" is "overstated," and that the defendant should not be penalized because of a possible delay in the judicial system. 470 U.S. 51, 60, 84 L. Ed. 2d 38, 47, 105 S. Ct. 1065, 1071.

As stated previously, the dichotomy between collateral attack and cases pending on appeal was most recently evidenced in *Allen v. Hardy* (1986), 478 U.S. ___, 92 L. Ed. 2d 199, 106 S. Ct. 2878, where petitioner sought *habeas corpus* relief predicated upon *Batson*. Relying on *Solem v. Stumes*, which also concerned a collateral attack, the *Allen* court held that *Batson* was nonretroactive. However, the Supreme Court specifically reserved the issue of the retroactive application of *Batson* to cases such as the one at bar which were pending direct appeal at the time *Batson* was decided.

In Illinois, the principles of *Batson* have been applied in *People v. Peters* (1986), 144 Ill. App. 3d 310, 494 N.E.2d 853, *People v. Lester* (1986), 145 Ill. App. 3d 720, and *People v. Taylor* (1986), 146 Ill. App.

3d 45. In *Peters*, the court avoided the issue of retroactive application and held that because there was no way to discern from the record which excluded jurors were black, defendant had insufficient evidence to support his assertion of discrimination. In *Lester*, the court also declined to directly address the question of retroactive application. However, in *dicta*, the court noted that, although the question of *Batson*'s retroactive status had not been determined, even if *Batson* were given retroactive application, based on the record before it, it could not have found an inference of discriminatory purpose. Finally, in *Taylor*, the court specifically declined to given *Batson* retroactive application. In reaching this determination, the *Taylor* court adopted the analysis of *Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338, a collateral attack case. Based on the established dichotomy regarding retroactive application, we disagree with the *Taylor* court's analysis and conclusion.

From the time of its ratification, the central concern of the fourteenth amendment has been to put an end to governmental discrimination on account of race. (*Strauder v. West Virginia* (1880), 100 U.S. 303, 306-07, 25 L. Ed. 664, 665, 10 Otto 303, 306-07.) In *Strauder*, the court found that the equal protection clause guarantees the defendant that the prosecution will not exclude members of his race from the jury venire for racial reasons. However, the *Strauder* court left open the door for jury discrimination by means of peremptory challenges when it further stated that a defendant had no right to a "petit jury composed in whole or in part of persons of his own race." (100 U.S. 303, 305, 25 L. Ed. 664, 665, 10 Otto 303, 305.) As a result, while the jury venire was composed of a cross-section pursuant to *Strauder*, prosecutors began to utilize their preemptory challenges to exclude members of the defendant's race from the petit jury.[1] Consequently, the principles of *Strauder* were obfuscated and defendants were still not being tried by members of their own race.

Nearly 100 years after *Strauder*, the United States Supreme Court recognized that a "State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." (*Swain v. Alabama* (1965), 380 U.S. 202, 203-204, 13 L. Ed. 2d 759, 763, 85 S. Ct. 824, 826.) Accordingly, the *Swain* court held that in the absence of a show-

---

[1] We recognize that the constitution does not guarantee a defendant that his jury will proportionately reflect the racial balance of his community. However, it does guarantee him freedom from deliberate interference with the jury selection process. *People v. Payne* (1983), 99 Ill. 2d 135, 155-56 (Simon, J., dissenting).

ing that prosecutors were systematically using their peremptory challenges to strike members of a particular racial group, a defendant could not inquire into the prosecutor's motives for excluding members of that group by the use of peremptory challenges. Undeniably, *Swain* placed a nearly insurmountable evidentiary burden on defendants.

In *Batson*, the United States Supreme Court recognized the continued inequities in the jury selection process when it stated, "The Constitution requires *** that we look beyond the face of the statute defining juror qualifications and also consider challenged selection practices to afford 'protection against action of the State through its administrative officers in effecting the prohibited discrimination.' " (*Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 82, 106 S. Ct. 1712, 1718, quoting *Norris v. Alabama* (1935), 294 U.S. 587, 589, 79 L. Ed. 2d 1074, 1976, 55 S. Ct. 579, 580.) As a result, the *Batson* court held that "the principles announced [in *Strauder* and its progeny] also forbid discrimination on account of race in selection of the petit jury." *Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 82, 106 S. Ct. 1712, 1718.

In principle, *Batson* effectively closes the door on the prosecution's repeated efforts to circumvent the mandates of *Strauder*. In our view, the fact that prosecutors have been permitted to exercise peremptory challenges to exclude members of racial groups does not constitute "justified reliance" sufficient to thwart the retroactive application of *Batson*. (See *Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338.) Since *Strauder*, it has been the responsibility of the prosecution to have nondiscriminatory reasons for the use of peremptory challenges. *Batson* merely requires that those reasons be articulated once a defendant establishes a *prima facie* case of purposeful discrimination. In our view, *Batson* is not the kind of "clear break with the past" that is automatically nonretroactive. See *Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338.

Therefore, it is clear that *Batson* does not establish new substantive rights. It merely attempts to more adequately protect existing rights set forth in the United States Constitution. Accordingly, it is our opinion that *Batson* is to be applied retroactively to the case at bar. In reaching this decision we adopt the sentiments of the late Justice Douglas of the United States Supreme Court: "We can never know what differences, if any, would have resulted if a trial had been held pursuant to constitutional standards of procedural due process." (*Daniel v. Louisiana* (1975), 420 U.S. 31, 33, 42 L. Ed. 2d 790, 793, 95 S. Ct. 704, 705-06 (Douglas, J. dissenting).) If the *Batson* principle is to be prospective only, the only way to dispense equal justice to Batson and

the defendant in our case would be a rule that stated that the *Batson* principle was to be applied prospectively only, and was not even available to Baston himself. See *Shea v. Louisiana* (1985), 470 U.S. 51, 84 L. Ed. 2d 38, 105 S. Ct. 1065.

▇▇ The established factors of retroactivity in criminal cases, as originally set forth in *Linkletter v. Walker* (1965), 381 U.S. 618, 14 L. Ed. 2d 601, 85 S. Ct. 1731, *Tehan v. United States ex rel. Scott* (1966), 382 U.S. 406, 15 L. Ed. 2d 453, 86 S. Ct. 459, and *Johnson v. New Jersey* (1966), 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772, provide further support for our decision: (1) the purpose to be served by the new standards; (2) the extent of reliance on the old standards; and (3) the effect of the administration of justice of a retroactive application of the new standards.

With respect to the first factor, the *Batson* court specifically states that the purpose of its decision is to eradicate the pervasive practice of racial discrimination in jury selection[2] and to uphold the constitutional right of equal protection under the laws. "Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.' " (*Batson v. Kentucky* (1986), 476 U.S. \_\_\_\_, \_\_\_\_, 90 L. Ed. 2d 69, 81-82, 106 S. Ct. 1712, 1718, quoting *Strauder v. West Virginia* (1880), 100 U.S. 303,

---

[2]To exemplify the pervasiveness of the practice of using peremptory challenges to exclude members of a particular race, the court in *People v. Frazier* (1984), 127 Ill. App. 3d 151, 469 N.E.2d 594, published a list of 46 cases in which this practice was an issue. Several months later, in October 1984, the *Frazier* list was supplemented in *People v. Lovelady* (1984), 101 Ill. 2d 573, 579-80, 468 N.E.2d 976 (Simon, J., dissenting). As a supplement to both *Frazier* and *Lovelady*, our research reveals the following additional cases decided since Justice Simon filed the *Lovelady* dissent: *People v. Williams* (1985), 109 Ill. 2d 391, 488 N.E.2d 255; *People v. Lyles* (1985) 106 Ill. 2d 373, 478 N.E. 2d 291; *People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402; *People v. Mack* (1984), 105 Ill. 2d 103, 473 N.E. 2d 880; *People v. Gaines* (1984), 105 Ill. 2d 79, 473 N.E.2d 868; *People v. Stewart* (1984), 104 Ill. 2d 463, 473 N.E.2d 1227; *People v. Taylor* (1986), 146 Ill. App. 3d 45; *People v. Lester* (1986), 145 Ill. App. 3d 720; *People v. Peters* (1986), 144 Ill. App. 3d 310, 494 N.E.2d 853; *People v. Dotson* (1986), 143 Ill. App. 3d 136, 492 N.E.2d 903; *People v. Williams* (1986), 140 Ill. App. 3d 116, 488 N.E.2d 587; *People v. Thomas* (1985), 139 Ill. App. 3d 163, 486 N.E.2d 1362; *People v. Smith* (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292; *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 483 N.E.2d 944; *People v. Green* (1985), 136 Ill. App. 3d 361, 483 N.E.2d 606; *People v. Walker* (1985), 136 Ill. App. 3d 177, 483 N.E.2d 301; *People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293; *People v. Nurse* (1985), 131 Ill. App. 3d 590, 475 N.E.2d 1000; *People v. Townes* (1985), 130 Ill. App. 3d 844, 474 N.E.2d 1334; *People v. Adams* (1984), 129 Ill. App. 3d 202, 472 N.E.2d 135; *People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140.

308, 25 L. Ed. 664, 666.) In our view, the preservation of our fundamental constitutional rights overrides any unsubstantiated concern for administrative difficulties (the third factor). "The effect of excluding minorities goes beyond the individual defendant, for such exclusion produces 'injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.' " *McCray v. New York* (1983), 461 U.S. 961, 968, 77 L. Ed. 2d 1322, 1326, 103 S. Ct. 2438, 2442 (Marshall, J., dissenting from denial of *certiorari*).

With respect to the second factor, *i.e.*, reliance on old standards, although *Batson* mandates a new procedure for establishing the prosecution's purposeful discrimination in the use of peremptory challenges, it does not impose a new responsibility on the prosecution. As stated previously, since *Strauder* the prosecution has been barred from excluding jurors on racial grounds. Now, if defendant establishes a *prima facie* case of purposeful discrimination, the prosecution must articulate the nondiscriminatory reasons it has always had the duty to have. The fact that these reasons have heretofore been within the personal knowledge of the individual prosecutors is not a legitimate argument against retroactive application. As stated in *Solem v. Stumes* (1984), 465 U.S. 638, 646, 79 L. Ed. 2d 579, 589, 104 S. Ct. 1338, 1343, "[u]njustified reliance is not a bar to retroactivity. [Instead, the query is whether] the new decision was foreshadowed by earlier cases."

Based upon the aforementioned, we affirm the judgment and sentence of the circuit court in all respects except as to the court's ruling on the issue of the State's discriminatory use of peremptory challenges. Regarding that issue, we remand the case to the circuit court for a hearing on the present record and any additional record on that issue the parties decide to make for the purpose of determining whether, pursuant to *Batson*, the prosecutor purposefully discriminated against blacks in executing her peremptory challenges. In the event the circuit court finds that the prosecutor did not purposefully discriminate, the court is directed to confirm the judgment and sentence. If the court finds that the prosecutor did purposefully discriminate, the court is directed to order a new trial. See *Saadiq v. Iowa* (Iowa 1986), 387 N.W.2d 315.

Affirmed in part and remanded with directions.

QUINLAN, P.J., and O'CONNOR, J., concur.